# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Criminal No. 22-cr-00064-RBW** |
| **v.** | **DEFENDANT CRUZ'S RESPONSE AND OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE REGARDING CAPITOL SURVEILLANCE CAMERAS** |
| **LLOYD CASIMIRO CRUZ JR,** | |
| **Defendant.** | |

Defendant Lloyd Casimiro Cruz, Jr, ("Cruz") by and through undersigned counsel, hereby files this Memorandum of Law in reply to the Government's Motion in Limine docketed at ECF Dkt. # 43 regarding Capitol surveillance cameras. Nothing about the history of the U.S. Capitol, its hallways, its chambers, or its offices is consistent with the government's efforts to turn the Capitol into a super-secure maximum-security prison-type or Pentagon-like facility.

## I.    OVERVIEW AND SUMMARY

The Government is wrongfully seeking to transform the Capitol—an open, public building in which thousands of Americans publicly interact with Congress, lobbyists, staff, and officials—into some kind of super-secure high-security quasi-prison-type facility. The Capitol, including sidewalks that surround the Capitol, have traditionally been open to the public," and "the primary purpose for which the Capitol was designed— legislating"—is entirely consistent "with the existence of

all parades, assemblages, or processions which may take place on the grounds."
*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F.Supp. 575 (D.D.C.
1972) at 584.  In *Brigade*, the court stated, "the fundamental function of a
legislature in a democratic society assumes accessibility to [public] opinion." The
Capitol is not a "national security" facility, and has no top-secret chambers or
spaces sealed off from the public to warrant the sudden shift into a maximum
security type building. Thus, in an effort to further their own objective and bring
baseless charges against people that were simply exercising their right to
demonstrate, the government is attempting to transform a historically known
building that was open to the public into a non-public highly secured facility. The
Courts must put a stop to these government efforts at over-reach.

The Government apparently hopes to prey upon the lack of awareness of
most people that the Capitol is not a top-secret missile base out in the countryside.
The Capitol building is many things, a public museum, a meeting place between
the citizens and their representatives, as well as the chambers for the Senate and
House to meet.  Most of the offices are in the associated three Senate Office
Buildings and three House Office buildings.  Meeting rooms and auditoriums in
the Capitol itself can be used by the public at the request of a Member of Congress,
such as for breakfast Bible studies or public policy presentations.  The Government
proclaims that the Capitol is "secured" – not closed – 24 hours a day, much as the

National Air and Space Museum is "secured" 24 hours a day.

The Government's Motion in Limine ("MIL") at Dkt. # 43 does not include a proposed order – as required by local rules -- from which we can get a more precise sense of what exactly is being asked and what this Court should decide.

Furthermore, to the best of our awareness, the Government did not consult with the defense counsel as required by local rules, nor consider the motion's relevance to this case, but the Government has kicked out these same motions in limine like an assembly line in all cases related to the events of January 6, 2021. That is, the Government has no basis for believing that this or its other MIL's are at all relevant to or fitted to this case.

However, the conclusion of the motion requests that *(emphasis added)*:

### CONCLUSION

For these reasons, the United States requests that this court enter an order, as described above, limiting the presentation of evidence ***about the precise locations of Capitol Police surveillance cameras, including through the use of Capitol Police maps***. If this court determines an evidentiary hearing is necessary to rule on this motion, the government asks that the hearing be held *ex parte* and *in camera*.

Moreover, the MIL at page 5 begins Section III with:

If the defense believes that presentation of the exact locations of the Capitol Police cameras is necessary, or that presentation of the Capitol Police map is necessary, the government requests that the Court conduct a hearing *ex parte, in camera* to resolve the issue.

That is, the Government clearly filed this MIL without knowing whether or

not it had any relevance to this particular case.  However, what the MIL seeks to be

asking is that the "exact" or "precise" locations of security cameras be treated as

secret and that a certain kind of map not be disclosed.

     Unfortunately, however, it does beg some questions as to:  (1) What does it

mean "exact" locations of Capitol Police cameras, and (2) what is a "Capitol Police

map?"  As discussed below, this matters.

     The problems with both of these categories is that – even though the

locations of these cameras is plainly not secret in the slightest – that this Defendant

and other Defendants are entitled to ensure that the Government is not withholding

video recordings that would be exculpatory and/or has not spoiled video from

certain cameras. Depending on what "exact" or "precise" locations mean, the

Defendant is entitled to know if video records that might exonerate him, might

help locate witnesses who were near the Defendant or are seen on security camera

video using a mobile device to take video recordings of the Defendant, assist in the

impeachment of witnesses against him, tend to show that a lesser offense applies,

help raise defenses, or argue for a lesser penalty if there is a conviction are being

suppressed, have been destroyed, or are even being inadvertently overlooked by

the Government.  Therefore, any Defendant is entitled to know the locations of _all_

video surveillance cameras which could potentially show the Defendant anywhere

where the Defendant was at any time.  Most of all Defendant is entitled to know

which cameras have their recordings missing in the information provided to him.

The Capitol is not a "national security" facility, and has no top-secret chambers or spaces sealed off from the public.   Every government in history has sought to transform itself into an exclusive, all-powerful, omniscient institution where the public must lay naked before the power of the state and disclose their every transaction and movement, while the state operates in secret with unlimited authority, discretion and budgets.

## II.    APPLICABLE LAW

The availability of evidence to a criminal Defendant is overwhelming and dominantly ruled by the due process rights of the U.S. Constitution and in particular by *Brady v. Maryland* and progeny.   Considerations of withholding information do not overshadow the rights of the criminal defendant.

The scope of the requirements of *Brady v. Maryland,* 373 U.S. 83 (1963),  is very broad.   *See* <u>United States Justice Manual</u> (USJMM) § 9-5.001.  For instance, a "prosecutor must disclose information that is inconsistent with any element of any crime charged" and --

> … must disclose information that either casts a substantial
> doubt upon the accuracy of any evidence---including but not
> limited to witness testimony—the prosecutor intends to rely
> on to prove an element of any crime charged, or might have a
> significant bearing on the admissibility of the evidence.  This
> information must be disclosed regardless of whether it is likely
> to make the difference between convictions and acquittal of
> the defendant for a charged crime.

*Id.*

The disclosure requirement, "applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence." *Id.* It is highly relevant that the Defendant is explicitly asking for specific information, not passively hoping that the prosecution will notice and think to disclose information on its own initiative.

> The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made....

*United States v. Agurs*, 427 U.S. 97, 106, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976)

> The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the Defendant and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.

*Moore v. Illinois,* 8212 5001, 408 U.S. 786,794-795,  92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)

> Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them.

*Gregory v. United States* 369 F.2d 185, 188 (D.C. Cir. 1966). See also, MODEL CODE OF PROF'L RESPONSIBILITY Rule 3.8(d).

The Supreme Court in *Brady* held that the Due Process Clause imposes on the prosecution an affirmative duty to disclose exculpatory information to the defense. Under Brady, suppression of evidence material to either guilt or punishment, whether or not there is bad faith on the part of the government, constitutes a due process violation. See 373 U.S. at 87, 83 S.Ct. 1194.

**We have defined "Brady material" as "exculpatory information, material to a defendant's guilt or punishment, which the government knew about but failed to disclose to the defendant in time for trial." *Coleman v. United States*, 515 A.2d 439, 446 (D.C.1986). (quoting *Lewis v. United States*, 393 A.2d 109, 114 (D.C.1978), aff'd after rehearing, 408 A.2d 303 (D.C.1979)).**

This case does not present the classic *Brady* situation involving information in the hands of prosecutors which they do not have an incentive to divulge. See *United States v. Brooks*, 296 U.S.App. D.C. 219, 221, 966 F.2d 1500, 1502 (1992). Here, the prosecutors never heard the tape and, therefore, could not have known whether the recording would have been exculpatory.

The government asserts that the duty to disclose information under Brady does not include a duty to investigate the records of the Department of Corrections. See *Lewis v. United States*, 393 A.2d 109, 115 (D.C.1978) ("The Brady principle does not imply a prosecutor's duty to investigate— and come to know— information which the defendant would like to have but the government does not possess."); *Levin v. Katzenbach*, 124 U.S.App. D.C. 158, 162, 363 F.2d 287, 291 (1966) ("[W]e do not suggest that the government is required to search for evidence favorable to the accused.").

**However, the *Brady* doctrine requiring disclosure of exculpatory information has been extended to situations where a division of the police department not involved in a case has information that could easily be found by the prosecutors if they sought it out, see *Brooks*, 296 U.S.App. D.C. at 221, 966 F.2d at 1502, and there is a duty to search**

> **branches of government "closely aligned with the
> prosecution,"** *id*. **at 222, 966 F.2d at 1503 (citation omitted).**
> **. . .**

*Robinson v. United States of America*, 825 A.2d 318 (D.C. 2003) *(paragraph break
added for emphasis and bold emphases added).*

A motion in limine was denied in a court where,

> [t]he defendants' willingness to discuss their activities with a
> DEA agent may suggest a lack of knowledge because they did
> not flee or hide their activities from law enforcement. See *Id*.
> at 2304 n.1 (stating knowledge can be shown through direct
> and circumstantial evidence, including evidence of "a
> defendant's concealment of his activities" and "evasive
> behavior with respect to law enforcement"); *United States v.
> Makkar*, 810 F.3d 1139, 1147-48 (10th Cir. 2015) (stating the
> court had a "hard time imagining more powerful proof" of
> lack of knowledge than that the defendant "turned to law
> enforcement for information about the drug's composition and
> offered to suspend sales until tests could be performed").

*United States v. Ritchie*, 2018 U.S. Dist. LEXIS 210267, *11-12, 2018 WL

6580570.

> Impeachment evidence, however, as well as exculpatory
> evidence, falls within the *Brady* rule. See *Giglio v. United
> States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d
> 104 (1972). Such evidence is "evidence favorable to an
> Defendant," *Brady*, 373 U.S., at 87, 83 S.Ct., at 1196, so
> that, if disclosed and used effectively, it may make the
> difference between conviction and acquittal. Cf. *Napue v.
> Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173 1177, 3 L.Ed.2d
> 1217 (1959) ("The jury's estimate of the truthfulness and
> reliability of a given witness may well be determinative of
> guilt or innocence, and it is upon such subtle factors as the
> possible interest of the witness in testifying falsely that a
> defendant's life or liberty may depend").

*United States v. Bagley*, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985).

## III.    ARGUMENT

### A. NO NATIONAL SECURITY IS INVOLVED.

Initially, there is of course no issue of national security involved in any way in this case or the MIL, and the attempt to invoke it is an insult to our intelligence.

Every government in history has sought to transform itself into an exclusive, all-powerful, omniscient institution where the public must lay naked before the power of the state and disclose their every transaction and movement, while the state operates in secret with unlimited authority, discretion, and budgets. The government is using the justification of highly sensitive information and a threat to national security in order to suppress video evidence that puts defendants in a positive light, while on the other hand providing video evidence to convict even when defendants are pleading guilty to the charges.

Despite these claims, there are videos that are widely available to the public from Jan. 6 which were already put out on the internet. Once something gets posted online it is incredibly difficult or otherwise impossible to remove and one can do a simple google search which will reveal hundreds of surveillance videos taken from the Capitol.[1] The government has provided no evidence or arguments to justify that the videos are prejudicial or expose national security risks when

---

[1] https://projects.propublica.org/parler-capitol-videos/

these videos are already widely available to the public through the internet. There have been plenty of videos posted online by people who went inside the Capitol whether it was cell phone footage or footage from go pros where the videos were limited to the perspective of the person recording. Besides the video footage taken by the public, the government allowed the release of some videos from cameras worn by Metropolitan Police Department officers.[2] In addition to that footage, prosecutors also agreed to release some Capitol surveillance that included footage from inside and outside the building. The CCV footage, which does not have any audio and typically shows events at a distance, does not produce the same effect as the individually recorded videos, nor do they provide anymore highly sensitive information than what is already available.

Furthermore, surveillance footage has been a large source of evidence for FBI agents and prosecutors to build cases against the nearly 700 people charged with participating in the riots.[3] Clips from these videos are commonly used as evidence of the government's proof that a defendant was in a specific area of the Capitol at a specific time.[4] As a result, defendants and their lawyers are allowed

---

[2] FBI Washington, FBI Washington Field Office Releases New Videos of Suspects in Violent Assaults on Federal Officers at U.S. Capitol, Seeks Public's Help in Identifying Them (2021), https://www.fbi.gov/contact-us/fieldoffices/
washingtondc/news/press-releases/fbi-washington-field-office-releases-new-videos-of-suspects-in-violentassaults-on-federal-officers-at-us-capitol-seeks-publics-help-in-identifying-them-070621.
[3] *Id.*
[4] *See U.S v. Guy Reffitt*, Crim No. 21-cr-32-DLF (D.C. Cir. 2021) at https://www.lawfareblog.com/first-trialcapitol-riot-defendant-shock-and-awe-campaign-video-audio-and-other-digital-evidence.

access to the surveillance footage, but under protective orders which ultimately

restrict their abilities to share the videos and other evidence they receive from the

government to the public that would cast them in a positive light or avoid

prejudice.  *See In re Application for Access to Certain Sealed Video Exhibits*, 546

F. Supp. 3d 1 (D.D.C. 2021).  In Nathaniel DeGrave's case, the prosecutor argued

that just because they allowed the release of footage in another case (which

consequently revealed where the particular camera was mounted in the Capitol), it

did not mean that the "floodgates should open."

  Ultimately, there is no secret what the Capitol looks like inside, and since

officials had already said they were upgrading the technology and locations of

surveillance equipment after Jan. 6, information about the positioning of cameras

during the riots would become useless and would not affect national security.[5]

Thus, the government cannot support their argument that the footage from the

surveillance cameras would be a threat to national security.

  However, if the Government were actually invoking the use of national

security information in the prosecution of this case, the Government would have to

do so by following and invoking the **Classified Information Procedures Act** at

18a U.S. Code Compiled Act 96-456, accessible at:

https://www.law.cornell.edu/uscode/text/18a/compiledact-96-456.

---

[5] United States Capitol Police, *After the Attack: The Future of the U.S. Capitol Police* (2021),
https://www.uscp.gov/media-center/press-releases/after-attack-future-us-capitol-police.

To invoke a claim that the precise locations of security camera videos are subjects of national security, the Government would have to move for a pretrial conference pursuant to 18a U.S. Code § 2.  Pursuant to 18a U.S. Code § 4, the Government would in effect have to make a proffer *in camera.*  The Court would have to hold a hearing 18a U.S. Code § 6.  One of the primary, most-favored options is to disclose the information to the Defendant but to restrict its re-disclosure by the Defendant to others.  18a U.S. Code § 6.

The Government cannot just throw around incredible claims of national security.  Even the Declaration for the MIL provides no support for any claim of national security issues.

## B. DEFENDANT HAS RIGHT TO MISSING OR DELETED VIDEO RECORDINGS

The common law right of access "is fundamental to a democratic state."  *See Judicial Watch, Inc. v. Schiff*, 998 F.3d 989 (D.C. Cir. 2021).  As a result, the Supreme Court has made "clear that the courts of this country recognize an unequivocal federal common law right to inspect and copy public records and documents, including judicial records and documents."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  In *Nixon*, the general rule was established that "all three branches of government, legislative, executive, and judicial, are subject to that common law right."  *Id.* at 903 (quoting *Schwartz v. U.S. Dep't of Just.*, 435 F. Supp. 1203, 1203 (D.D.C. 1977)).  This right is so

precious that it even precedes the Constitution.  The Court defined the term "public records" subject to the common law right of public access to mean "a fundamental interest in adequately protecting the public's interest in keeping a watchful eye on the workings of public agencies." *Washington Legal Foundation v. U.S. Sent'g Comm'n*, 89 F.3d 897, 905 (D.C. Cir. 1996).  Under this common law right, a "public record" was "a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived." *Id.*

The interests of the general public in the openness of governmental processes weighs in favor of disclosure of surveillance videos because that right of access is fundamental to our democracy.  The events of Jan. 6 are "of deep national importance" because there is a strong public interest in seeing real-time images of what happened that day after the government has already released some to the public for identification and purposes of conviction.  *See United States v. Hubbard*, 650 F.2d at 318; *see also United States v. Klein*, 533 F. Supp. 3d 1, 4-7 (D.D.C. 2021) (referring to portions of the April 9 hearing when body-worn camera footage was shown).  The surveillance videos are "public records" within the relevant framework and because the government's interest in keeping them secret is outweighed by the significant public interest in the disclosure of the footage.

Furthermore, this Defendant and all of the so-called Jan. 6 Defendants are

entitled by the Due Process mandates of the U.S. Constitution to have access to all evidence that might tend to show their innocence or the applicability of a less-serious offense only, support defenses, or mitigate punishment. Thus, the dominant consideration is disclosure to criminal defendants as mandated by the Constitution, which predominates over any question of withholding information.

For example, in the Oath Keepers' case of *USA v. Rhodes, et al.*, there is a controversy that Defendants there turned to assist U.S. Capitol Police officers against a violent subgroup of the crowds threatening the police, thereby proving they were not in the Capitol to take over the Capitol or oppose the authority of its police force, but that the surveillance camera videos of that place in the Capitol appears to have vanished. Despite being in a heavily-trafficked hallway frequently open to tourists, tours of school children, and the general public just off the Rotunda, there appears to be a claim that there are no cameras viewing that location in the building. Where views of the Capitol are inculpatory, they always seem to be available. When views of the Capitol would exonerate Defendants, they often seem to be missing.

Therefore, Defendant Cruz might well need to and be entitled to explore where there are security cameras mounted within the Capitol building in relation to the apparent absence of video showing particular areas within the building or around its exterior, etc.

Unfortunately, neither the Motion in Limine ("MIL") nor any other information supports the idea that the Capitol's security systems are anything but an old, low-tech, unsophisticated version of the security found at any private store like Walmart. The windows and doors of the Capitol are flimsy as revealed by – ironically – the same surveillance camera videos showing how unruly hooligans broke in to the windows and doors easily. Despite appropriating trillions of dollars for spending on infrastructure upgrades around the country, Congress has not spent money for Capitol security.

> Officers had been asking for gas masks and helmets for at least three years prior to the insurrection.
>
> > "Problem was that all of our gear was expired. The helmets, basically the padding on the inside was gone. I mean, picture putting on like a football helmet from 1985 and going out and playing football in that thing," the second officer said. "It's basically a piece of plastic over your head that if you get hit, there's no padding in it. It's all dry rotted. It's fallen out. You're toast."
>
> The officer added that they saw CDU hard squad officers fighting with helmets that were too big.

Chris Marquette, "Capitol Police faced equipment shortage during Jan. 6 attack: Rioters in many cases had more, and better, protective equipment than the officers they were fighting," ROLL CALL, May 17, 2021, accessible at: https://rollcall.com/2021/05/17/capitol-police-faced-equipment-shortage-during-jan-6-attack/.

Readers should not misunderstand: Defendant and counsel believe that the Congress should take some of those trillions of infrastructure spending and

upgrade the Capitol, much as the White House was upgraded after September 11.

But the assumption suggested by the Government now that security cameras at the Capitol are cutting-edge has not been supported by the Government in this or other motions.

The Declaration of Thomas A. Dibiase is detailed and well-drafted but not relevant. However the Declaration is mostly about how a third party can request video from the U.S. Capitol Police.

Here, however, it is the Congress and its subdivision the U.S. Capitol Police which has taken the initiative to prosecute hundreds of people, some guilty, most innocent.

### C. WHY THE MOTION IN LIMINE IS NOT WARRANTED

First, why would anyone care about the "exact" location of the Capitol's security cameras? The only point of interest is whether certain areas of the U.S. Capitol building, exterior, and grounds are visible on surveillance cameras – not the exact location of the cameras.

If someone had nefarious intent, they could perhaps be interested in knowing if there are any "blind spots" in the views "seen" by the security cameras. But the Capitol Police could always just install more cameras if there is a blind spot. And cross-examination about video recordings revealed would not tell someone there aren't other cameras showing other angles of the same area.

And unfortunately that is also the Defendant's legitimate interest as well. Are there angles or views of the events involving the accusations against him that might be recorded which he has not been provided with?  Are there cameras that might show something exculpatory.

Second, this is not secret.  The Government has released publicly thousands of "stills" (frozen frames of the video recordings) and/or hundreds of video recordings from every relevant area of the U.S. Capitol, it's exterior, and its grounds already.

The Government's MIL fails because the Government has already on its own volition disclosed this information widely and publicly.  Any teenager remotely familiar with video cameras can extrapolate from the publicly-released videos of where the cameras are viewing the scenes in the videos released.  It does not take any special skill to look at the video recordings the Government already released and figure out where the cameras are.

Because the locations of the cameras are not secret – due to the Government's own actions – a motion in limine is not warranted.

Third, the MIL also fails because the Capitol Police could simply move the cameras in the future if it regrets publicly releasing these video recordings viewing certain areas of the Capitol.  That is, the harm is not incurable.

Fourth, the placement of cameras is overwhelmingly obvious with the

Capitol as well as with most locations.  It is obvious that heavily-trafficked, central, main, important areas will have cameras viewing those areas, private areas like bathrooms will not, and that – unlike "Mission Impossible" movies – there are no blind spots of any significance in an important government building like the U.S. Capitol.  That is not because the Capitol enjoys any unusual or cutting edge security system, but just because that has been common sense in security arrangements probably since the 1970s.

## IV.    CONCLUSION

THEREFORE, Defendant Cruz respectfully requests that the Court deny the Motion in Limine to the extent that it might limit the Defendant's ability to question and/or cross-examine as to what cameras might exist that could provide different angles or different views of the Defendant and his actions or activities of which he is charged with alleged crimes.  This may include the Capitol Police's maps of where cameras are located.  Depending on what is meant by "exact" or "precise" locations – is it within dozens of feet, within feet, within inches?  -- what matters is whether events that could be exculpatory to the Defendant are visible to the camera and were recorded, and whether any video has been deleted, lost, or misplaced.

Dated:  October 13, 2022                    RESPECTFULLY SUBMITTED

/s/ John M. Pierce
John M. Pierce
21550 Oxnard Street
3rd Floor, PMB #172
Woodland Hills, CA 91367
Tel: (213) 400-0725
jpierce@johnpiercelaw.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed on this October 13, 2022, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants, including:

> Mr. Andrew J. Tessman, Esq.
> DOJ-USAO
> District of Columbia - Detailee
> 300 Virginia Street East, Suite 4000
> Charleston, WV 25301
> Telephone:   304-340-2234
> E-mail:  andrew.tessman@usdoj.gov

> /s/ John M. Pierce