# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case 1:22-cr-00064-RBW** |
| | : | |
| **LLOYD CASIMIRO CRUZ, JR.** | : | |
| | : | |
| **Defendant.** | : | |

_____

### DEFENDANT LLOYD CASIMIRO CRUZ, JR.'s
### SENTENCING MEMORANDUM

Plaintiff LLOYD CASIMIRO CRUZ, JR. ("Cruz") by undersigned counsel, hereby submits to the Court his Sentencing Memorandum.   Defendant Cruz separately moves the Court for leave to exceed any applicable page limits.

## I.   INTRODUCTION AND OVERVIEW

Defendant Cruz was charged by Superseding Information on March 11, 2022, which was filed at ECF Dkt # 12.  The Superseding Information (like the original Information) did not contain any factual allegations other than the date and restating the statute.  The arrest warrant and Complaint was supported by a Statement of Facts filed on February 25, 2022, as Attachment # 1 to Complaint filed at ECF Docket #1.

Cruz was charged in the Superseding Information with two misdemeanors:

### <u>COUNT ONE</u>

On or about January 6, 2021, in the District of Columbia, LLOYD CASIMIRO CRUZ, JR did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the

Vice President was and would be temporarily visiting, without lawful authority to do so.

(Entering and Remaining in a Restricted Building or Grounds, in violation of Title 18, United States Code, Section 1752(a)(1))

## COUNT TWO

On or about January 6, 2021, in the District of Columbia, LLOYD CASIMIRO CRUZ, JR willfully and knowingly paraded, demonstrated, and picketed in any United States Capitol Building.

(Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G))

For Count I, Defendant Cruz was charged with 40 U.S.C. 5104(e)(2)(G) by "Parading, Demonstrating, or Picketing in a Capitol Building," which requires that:

**18 U.S.C. § 1752(a)(1):**
* * *
**(a)** Whoever—

**(1)** knowingly enters or remains in any restricted building or grounds without lawful authority to do so;
* * *
*[may be punished with up to one year in jail, fined, etc.]*

For Count II, Defendant Cruz was charged with 40 U.S.C. 5104(e)(2)(G) by "Parading, Demonstrating, or Picketing in a Capitol Building," which requires that:

**40 U.S.C. 5104(e)(2)(G)**
* * *
**(e)** CAPITOL GROUNDS AND BUILDINGS SECURITY.—
* * *
**(2)** VIOLENT ENTRY AND DISORDERLY CONDUCT.—An individual or group of individuals may not willfully and knowingly—
* * *
**(G)** parade, demonstrate, or picket in any of the Capitol Buildings.
* * *

2

Although there is a definition section to the statute, there is no statutory definition provided for "parading" or "demonstrating" or "picketing."  There is no statutory definition of "Capitol building" although it may be understood that the U.S. Capitol complex / campus includes many buildings other than the U.S. Capitol itself, and that the Capitol is also "a Federal building."  Counsel has serious constitutional and statutory construction concerns about the validity of a statute where parading, demonstrating, and/or picketing are in the eye of the beholder and subject to no standards.

## II.  MAXIMUM PENALTY

A.  The Maximum Penalty for a violation of is 18 U.S.C. § 1752(a)(b)(2) under Count I:

> "(2) a fine under this title or imprisonment for not more than one year, or both, in any other case."

Pursuant to "18 U.S. Code § 3571 - Sentence of fine" the amount of a fine is "(6)  for a Class B or C misdemeanor that does not result in death, not more than $5,000;"

Here, in this case, Defendant Cruz did not commit any act nor was he charged with any crime of causing death or any bodily injury.  Therefore, the maximum fine that can be imposed is $5,000.

B.  The Maximum Penalty for a violation of 40 U.S.C. 5104(e)(2)(G) under Count II

for Parading, Demonstrating, or Picketing in a Capitol Building, is:

> a. a term of imprisonment not more than 6 months;
> b. a term of probation of not more than 5 years;
> c. a fine not to exceed $5,000; and
> d. a special assessment of $10.

C.  Restitution Not Available

The Presentence Report recites that the Defendant had agreed to a $2,000 payment of restitution.  This was discussed.  However, on further reflection and legal understanding, Defendant Cruz would recommend and ask the Court to order a $2,000 fine – but not labeled as restitution.

3

Defendant and counsel fully understand that courts may frequently engage in a sliding scale between imposing time in jail as opposed to a fine. Such flexibility can be important to the courts and to the crowding of jails. Therefore, the unavailability of an order of restitution may be a bit of a distinction without a (financial) difference and the Court may combine jail time with a fine.

However, Defendant Cruz like many January 6 Defendants is more motivated by wanting to return the United States of America to traditional, logical, objective not subjective applications of the law and due process than about themselves. Thus, maintaining "regular order" and doing things right is important whether it changes the financial end result or not.

An order of restitution is not available because the Defendant did not damage any property or cause any other loss: The statute cited by the Government in its Sentencing Memorandum **18 U.S. Code § 3663 - Order of restitution** requires (in relevant part):

> **(a)**
>      * * *
> **(B)**
> **(i)**The court, in determining whether to order restitution under this section, shall consider—
> > **(I)** the amount of the loss sustained by each victim as a result of the offense; and
> >     * * *

That is, restitution is only authorized for a "loss" that is "as a result of the offense." But the relevant offense to which Defendant Cruz has been found guilty is 40 U.S.C. 5104(e)(2)(G).

There has been no loss suffered by anyone from Cruz "parading" or "demonstrating" or "picketing" – once again recalling that if one might interpret those terms in other ways, other statutes would separately apply. Thus, no loss has been sustained by non-disruptive, peaceful "parading" or "demonstrating" or "picketing" by Cruz. Certainly there have been no losses from Count I. Therefore, although the Court may be authorized to order restitution, the applicable amount in this

case totals $0.00. [1]

Cruz has stipulated to entering a restricted area and entering the U.S. Capitol.  But he did not stipulate to nor was he charged with damaging anything or hurting anyone.  He would consider it a problem with his conscience and honor to be ordered to pay restitution when he never harmed anything or anyone.  It may not make much difference to the Court, but it does matter to the Defendant if any order implies that he hurt anyone or broke anything.

### III. SENTENCING REQUESTED BY DEFENDANT BY ALTERNATIVE MISDEMEANOR TREATMENT UNDER SENTENCING GUIDELINES

As stated by the Presentence Report, "Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an information. Accordingly the US Sentencing Guidelines do not apply to these counts.

Therefore, the Court's sentencing decision and evaluation is not governed by the US Sentencing Guidelines.  Nevertheless, the parties mention the factors that would have been used if they did apply as some guidance that the Court might consider.

Defendant Cruz requests as the Court's resolution of this matter as follows:

1) Cruz has already "served" two years of supervised probation successfully and to the satisfaction of the probation officer in Missouri.

2) Cruz suggests that his sentence include completing an additional 1-2 year probation without any violation of law or any act of violence or angry confrontation, charged or uncharged, except if committed against him by another.  This should not include traffic or administrative infractions or offenses, including minor matters like business licensing, and should be precisely defined to avoid simply postponing proceedings.

---

[1]     Again, the USAO analyzes for every defendant restitution as if every defendant were guilty of every act committed by anyone else, without regard to actual individual guilt.  Restitution by person A cannot mean paying for harm caused by person B.

That is, vague or over-broad conditions merely invite more burden on the courts and increase risk and burden on a Defendant such that the case is almost not really over but simply prolonged.  Any other terms or conditions of probation may not constitutionally impinge upon the constitutional rights of a Defendant, including compelled speech agreeing with the prosecutor's political views or censoring Cruz in the expression of his political beliefs.

3) A fine of $2,000 to $3,000 provided that Defendant Cruz be allowed to pay in installments over two years as his financial situation allows and not due entirely immediately.  The Court can understand that as the Defendant is able to get back into a semi-normal life and be employed he will be in a better position to repay over time.  Cruz would try to fund-raise to help pay the fines.  Cruz hopes that if his life returns to something like normal he will be able to increase his income.  The Report notes that Cruz has retained counsel but this is not the indicator it might be in ordinary cases.  Most attorneys helping in these cases understand that they might never get paid, but are fighting to preserve the core foundations of due process and evidence-based justice, and the opportunity to get paid may depend upon raising funds by those who share the attorneys' goals.

4) Defendant requests to have any payment of a fine characterized as a fine not as restitution because people may misunderstand as if Cruz hurt anybody or damaged any property, which he did not.

5) If Cruz serves time in jail, there will be no one to care for his children especially while his wife is working.

6) If Cruz serves 30 or more days in jail, he is informed that he will lose his social security benefit payments and will need to reapply, which he understands is difficult in

Missouri.  So he will be without funds.

7) Given Cruz's caretaker responsibilities for his children and the implied concerns of the Presentencing Investigative Report about ability to pay, the Court could including obligatory community service under §5F1.3 of the U.S. Sentencing Guidelines.  The Guidelines discourage ordered service over 400 hours but do so on the grounds of administrative burden to the judicial system, not as a limitation with regard to a defendant.  Therefore, the Court is authorized to resolve challenges to sentencing by including community service in its mix.  However, Cruz reports that he would need to find or be referred by a Missouri probation officer to needs for help in Polo, Missouri, because the nearest big city Kansas City is around 60 miles away.

## IV. SENTENCING RECOMMENDED BY PRESENTENCE INVESTIGATION REPORT AND OBJECTIONS TO PRESENTENCE INVESTIGATIVE REPORT

The Presentencing Investigative Report recommends the following, although after admitting that the U.S. Sentencing Guidelines do not actually apply, and based on including a large number of criminal events from 18 to 25 years ago which counsel believes may not be considered, that the Court sentence Defendant Cruz as follows:

a) The Probation Office correctly treats both Counts I and II together for the purposes of sentencing.  In fact, the same facts and occurrences are covered under both laws.  Count I and Count II are merely different legal versions of trespassing in the U.S. Capitol and Capitol grounds.  If counsel reads the report correctly, both Count I and Count II add up to a Base Offense Level of **4 points** sounding in trespass.

b) The Probation Office incorrectly recites under "Specific Offense Characteristics" for an **additional 2 points** a discussion of what "certain individuals" did and general

circumstances affecting the 10,000 demonstrators around the Capitol on January 6, 2021.
The discussion in paragraph 33 is not material to Defendant Cruz as an individual.  Nor
does it relate to anything that would affect Cruz's limited trespassing actions or events.
To the extent that any of the details mentioned in paragraph 33 could be remotely relevant
– instead of what _other people_ did – it is merely duplicative and redundant of the +4 point
base offense, and adds nothing to justify a point increase.  In other words, _what other
people did_ or what "certain individuals" did or what the crowd did cannot justify any point
increase.  Therefore, the "Special Offense Characteristics" are merely a restatement of the
base offense.  No additional points are appropriate.

c) The Probation Office argues with regard to Count II, "The maximum term of
imprisonment six months for this Class B Misdemeanor."  However, the report does not
offer a separate recommendation for Count II, but combines it with Count I.

d) The Probation Office argues with regard to Counts I and II, "….  Based on a total offense
level of 6 and a criminal history category of V, the guideline imprisonment range is nine
months to fifteen months.  Since the statutory maximum sentence is twelve months;
therefore, the applicable guideline range is nine to twelve months. USSG §5G1.1(a)."

## V. CORRECTED CALCULATION OF FACTORS AND POINTS

a) The Base Offense Level for the trespassing category for both Count I and Count II add up
to a Base Offense Level of **4 points** sounding in trespass.

b) For "Specific Offense Characteristics"  **0 points** should be added because there is no
distinction between the base offense and the characteristics of the offense.  It is 4 points
for trespassing in the U.S. Capitol and on U.S. Capitol Grounds, here though only as

misdemeanors.  The "Specific Offense Characteristics" *are* the offense without distinction, as an identity.

c)  The defendant qualifies for a reduction of **-2 points** for acceptance of responsibility. Mr. Cruz stipulated to all aspects of the elements of Counts I and II.  Cruz stipulated that he had committed every aspect of violations of Count I and Count II.  He accepted full responsibility for the instant offense.  Cruz truthfully admitted to his conduct relating to the instant offense.  The stipulations document labeled "Statement of Offense" was negotiated with the prosecution and provided the USAO the opportunity to raise any concerns it might have about the truthful and complete admissions by Defendant Cruz. The prosecution, which helped write the "Statement of Offense," has not identified anything which was not truthful, which was misleading, or incomplete.  Furthermore, the FBI Special Agent (here unnamed) who swore under oath in the Statement of Facts reports Cruz's cooperation including four different times when Cruz voluntarily met with the Agent and cooperated and volunteered information, and no occasions on which Cruz did otherwise.  If there were anything in the stipulations that was untruthful or insufficient, the prosecution failed to point it out at the time, but agreed to and helped write the stipulations.  The Government does not identify any untruth now.

d)  A total of **0 points** should be awarded for criminal history because under the U.S. Sentencing Guideline, all incidents of Cruz being convicted early in his life are time-barred by the passage of time and/or excluded based on topic (such as traffic, vehicle licensing, vehicle insurance tickets) or both.  The Criminal History Category is in Zone A.

e)  Therefore, the correct total of points is **+2 points** overall for sentencing:

+4 Base Offense

+0 Specific Offense Characteristics (as redundant)

-2  Acceptance of Responsibility and cooperation

+0 All criminal history items are time-barred or excluded by topic (e.g., traffic offenses or vehicle licensing issues), or both..

=   2 sentencing points.

f)   Under the Sentencing Guidelines, sentencing of 0 to 6 months in jail are applicable along with other alternative punishments, such as

## VI. GOVERNING LAW FOR SENTENCING

As the USAO explained in a plea letter to another client of undersigned counsel similar to this case:  "the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. 3553(a).  Your client further understands that 40 U.S.C. § 5104(e)(2)(G) is a class B misdemeanor, as defined by 18 U.S.C. 3559(a)(7).  Accordingly, pursuant to §1B19 of the United States Sentencing Commission, Guidelines Manual (2018), the sentencing guidelines do not apply to your client's sentencing."

Federal law codified at 18 U.S.C. § 3553 "Imposition of a Sentence" authorizes a federal court to impose a sentence upon the conviction of a defendant for a crime, including by a plea of guilty, in accordance with that statute's terms and the guidelines promulgated by the U.S. Sentencing Commission under it authority at law.

Sometimes sentencing depends upon specific facts which have not been established and/or disputed, even outside the trial or even though the trial or a plea deal are concluded.

The U.S. Sentencing Commission, Guidelines Manual, Annotated 2021 Chapter 6 -

Sentencing Procedures, Plea Agreements, And Crime Victims' Rights explains:[2]

Commentary

Although lengthy sentencing hearings seldom should be necessary, ***disputes about sentencing factors must be resolved with care***. When a dispute exists about any factor important to the sentencing determination, ***the court must ensure that the parties have an adequate opportunity to present relevant information.*** Written statements of counsel or affidavits of witnesses may be adequate under many circumstances. See, e.g., United States v. Ibanez, 924 F.2d 427 (2d Cir. 1991). ***An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues***. See, e.g., United States v. Jimenez Martinez, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); United States v. Roberts, 14 F.3d 502, 521(10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity); see also, United States v. Fatico, 603 F.2d 1053, 1057 n.9 (2d Cir. 1979), cert. denied, 444 U.S. 1073 (1980). The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.

In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. See 18 U.S.C. § § 3661; see also United States v. Watts, 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); Witte v. United States, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution); Nichols v. United States, 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered defendant's prior criminal conduct even when the conduct did not result in a conviction). Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy. Watts, 519 U.S. at 157; Nichols, 511 U.S. at 748; United States v. Zuleta-Alvarez, 922 F.2d 33 (1st Cir. 1990), cert. denied, 500 U.S. 927 (1991); United States v. Beaulieu, 893 F.2d 1177 (10th Cir.), cert. denied, 497 U.S. 1038 (1990). Reliable hearsay evidence may be considered. United States v. Petty, 982 F.2d 1365 (9th Cir. 1993), cert. denied, 510 U.S. 1040 (1994); United States v. Sciarrino, 884 F.2d 95 (3d Cir.), cert. denied, 493 U.S. 997 (1989). Out-of-court

---

[2]   **https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-6**

declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means.  United States v. Rogers, 1 F.3d 341 (5th Cir. 1993); see also United States v. Young, 981 F.2d 180 (5th Cir.), cert. denied, 508 U.S. 980 (1993); United States v. Fatico, 579 F.2d 707, 713 (2d Cir. 1978), cert. denied, 444 U.S. 1073 (1980).  Unreliable allegations shall not be considered.  United States v. Ortiz, 993 F.2d 204 (10th Cir. 1993).

*Id. (Bolded and italicized emphases added).*

## VII.   TRIAL ON STIPULATED FACTS

On advice of counsel for the purposes of appeal, Cruz has maintained his plea of non-guilty.

After an exchange of motions practice which on the advice of counsel Defendant Cruz preserves for appeal, the submission of proposed jury instructions, and the like, Cruz by counsel and the U.S. Attorney's Office as prosecutors entered into a comprehensive stipulation titled as a "Statement of Offense" (intended as stipulations) filed on January 13, 2023, at ECF Dkt. #73. Because of the centrality of this document, it is attached again as well as being in the record.[3]

Therefore, the parties stipulated to the facts, including all facts sufficient for the Court to rule, and then some arguably supplemental facts.  Of course stipulations almost always cover less than the entire range of facts in dispute and/or necessary to a resolution of the case, unlike here.

For purposes of appeal, Defendant Cruz maintains certain good faith objections to the laws applied, and certain motions important to him after consultation with client, including the nature of the Government's "General Warrant" as a dragnet which he believes violates the Fourth Amendment, but did not object to the operative facts.

Accordingly, Cruz waived a jury trial by notice filed at ECF Dkt. # 74 filed on January 13, 2023.  On January 13, 2023, the Court held a bench trial on the stipulation of the facts memorialized

---

[3]       It should be noted that the stipulated facts are specific to the wishes and circumstances of this client, this negotiated exchange of stipulations for this purpose, and circumstances of this case and do not necessarily represent the positions that might be adopted by the same counsel in other cases.  E.g., this Defendant accepted representations by the Government which any other January 6 Defendants would dispute.

by Minute Order entered in the record on January 13, 2023.  No other evidence or testimony was presented at the bench trial other than the stipulation of the facts.

Accordingly, the Court found Cruz guilty of Counts I and II based on the stipulations.  The Court's review of the stipulations and decision was actually far less of a burden and consumed less time and paperwork than the usual formal plea deal colloquies.

The Court set sentencing for hearing on May 2, 2023, at 9:00 AM, with the parties' Memoranda due on April 26, 2023 [customarily by midnight].

### A.  NO CRIMINAL HSTORY APPLIES

Under the U.S. Sentencing Guidelines, criminal history does sunset, with the expiration times depending upon the seriousness of the conviction.

1. The Defendant was a juvenile until December 5, 2000.

2. We are not aware of any juvenile convictions, but they would be time-barred and excluded if there were.

3. Therefore, with rare exceptions any criminal charge that was sentenced on or before December 5, 2000, is time-barred and excluded for these particular purposes of sentencing.  See  "(4)    The applicable time period for certain sentences resulting from offenses committed prior to age eighteen is governed by §4A1.2(d)(2)."

4. Neither the Presentencing Investigative Report nor the prosecution have established the grounds for any variance from exclusion.

5. The U.S. Sentencing Guidelines require that:

### §4A1.2.   Definitions and Instructions for Computing Criminal History

#### (a)    Prior Sentence

(1)    The term "prior sentence" means any sentence previously

imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of <u>nolo contendere</u>, for conduct not part of the instant offense.

(2)    If the defendant has multiple prior sentences, determine whether those sentences are counted separately or treated as a single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (<u>i.e.</u>, the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Treat any prior sentence covered by (A) or (B) as a single sentence. <u>See also</u> §4A1.1(e).

For purposes of applying §4A1.1(a), (b), and (c), if prior sentences are treated as a single sentence, use the longest sentence of imprisonment if concurrent sentences were imposed. If consecutive sentences were imposed, use the aggregate sentence of imprisonment.

* * *

(e)    Applicable Time Period

(1)    Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

* * *

6.  Therefore, any prior sentence imposed on or before April 25, 2008, is time-barred and excluded (if the sentence was for 1 year and month or less).

7.  Furthermore,

(2)    Any other prior sentence that was imposed within ten years of the defendant's commencement of the instant offense is counted.

(3)     ***Any prior sentence not within the time periods specified above is not counted.*** (Emphasis added.)

* * *

8.  Therefore, any sentence imposed of less than one year and one month is time-barred and excluded if it occurred on or before April 24, 2013.

9.  In paragraph 42 of the Presentence Investigative Report, a sentence was imposed on January 7, 2005, from a charge on November 12, 2004, involving drugs. This charge is time-barred and must be excluded. The +3 points claimed must be removed.

10. In paragraph 42-43, supervision (probation monitoring) violations are listed on November 20, 2005, through July 18, 2007. These are time-barred and these 3 points must be removed and excluded from the calculations.

11. In paragraph 44, the Report lists a sentence imposed on July 18, 2007, from a February 1, 2006, charge of theft (apparently receiving stolen goods over $500). These are time-barred and the 3 points assigned for this charge should be removed and excluded.

12. In paragraph 45, the Report lists a sentence imposed on July 18, 2007, from a May 5, 2007, charge of forging a check. This is time-barred and these 3 points must be removed and excluded.

13. In paragraph 46, the Report **summarizes a total** of 12 points from criminal history, producing a total of a criminal history category of V. In fact, the criminal history items are all time-barred and excluded. All of these points must be removed. As a result, the correct criminal history points are 0 points.

14. In paragraphs 47 through 53, the Report lists traffic and automobile related infractions (insurance or car decals). These are excluded by topic and type, but the Report does not

assign them any points or significance for sentencing now.

15. Therefore, the Court must consider that the criminal history is 0 points.

16. As far as we know, there are no juvenile convictions.  However, although there are exceptions for juveniles, none of the grounds for an exception from juvenile treatment have been established or suggested.

17. In any event, the Court ought to notice from the record that there is ***a distinctive improvement arc*** from a troubled early adulthood to a long period of a law-abiding adult. The purpose of looking for improvement is supported by a strong upward (improvement) pathway toward no criminal behavior for 16 years.

18. As a result, all of the criminal history considerations should be counted as positive for the Defendant.  Other than the instant offenses, the record shows that the Defendant had clearly reformed and become a law-abiding citizen after some unfortunate early incidents. This indicates that his early mistakes had a profound impact on him and caused him to turn away from them.


**B.  POINTS FOR "BASE" OFFENSE**

The Government appears to categorize both Counts I and II as "trespassing" for a base offense level of 4 points applying to both together.

Although one charge is for "parading," "demonstrating," or "picketing," there are other parallel statutes which address any sort of actual disruption or damage or violence in the Capitol or any federal building.  Thus we must consider only the kind of "parading," "demonstrating," or "picketing," which is in and of itself *NON-DISRUPTIVE*, non-violent, and not harmful in itself. Again, other statutes address those types of actions, such as 17 U.S.C. § 1752(a)(2); 40 U.S.C. §

16

5104(e)(2)(D);  18 U.S.C. § 1752(a)(4); or 18 U.S.C. § 5104(e)(2)(F).

## C.  REDUCTION FOR COOPERATION

If the Court were to consider the Guidelines for information for a Class B Misdemeanor, the Defendant's pleading guilty and cooperation would cause a 2 point reduction.

1. The Presentencing Investigative Report leans on the technicality that the Defendant did not plead guilty to deny points for Cruz's cooperation.

2. However, this is a severe mistake of form over substance.

3. On the contrary, Cruz stipulated to all the facts of the elements of Counts I and II and waived a jury trial.  Cruz requested that the Court conduct a bench trial on the stipulated facts, so that a trial could be avoided while preserving his opportunity to appeal some important legal points.

4. However, more to the point, in the Statement of Facts

    i. Cruz voluntarily spoke with the FBI (as the Special Agent – unnamed here -- phrased it) on May 19, 2021, and gave full and frank information helpful to the FBI.  Cruz traveled to the Kingston, Missouri, courthouse to meet with the FBI, rather than wait or expect the Agent to come to him.

    ii. Cruz noted that he could probably find a long video recording and agreed to look for it and call the FBI when he located it. (Again note that during this voluntary interview Cruz was not at home but was at an agreed upon meeting place convenient to both.  Therefore the implication is that he would have to search when he got back home.)

    iii. On June 1, 2021, [that is, 11 days later] "Cruz again agreed to speak with me

voluntarily" as the FBI Special Agent phrased it.

iv. Cruz then handed over photographs and videos from his January 3-8, 2021, time in Washington, D.C. (that is handed over at his home in Missouri, concerning Washington, D.C.)

v. Cruz signed a "Consent to search" form giving the FBI permission to examine the contents of the "thumb drive."

vi. On July 23, 2021, the FBI Special Agent interviewed Cruz telephonically. The FBI Special Agent describes this as "Cruz again agreed to speak with me voluntarily."

vii. On August 26, 2021, the same FBI Special Agent interviewed Cruz for a fourth time. The Statement of Offense by this FBI Special Agent again describes this as "Cruz again agreed to speak with me voluntarily."

viii. On August 26, 2021, the FBI Special Agent showed Cruz photographs from the Capitol building's security surveillance camera system and Cruz agreed and admitted that the photograph showed himself in the scene, and voluntarily got up and went to find in his residence the same hat that was shown in the photograph and allowed the same FBI Special Agent to take a photograph of the Trump hat both shown in the security camera video and present there in Cruz's residence and in Cruz's presence.

**D.  RESULTING POINTS**

The points that should be assigned under the Guidelines would be 4. Therefore, a sentence of 0 to 6 months in would be allowable.

Pursuant to the U.S. Sentencing Guidelines, Defendant Cruz' admitted misdemeanor offense is within the "Zone A" that includes "Offense Levels" of 1 through 8. The recommended sentence is zero (0) to six (6) months regardless of whether the Offense Level for Cruz is anywhere between 1 to 8. The governing statutes and the Sentencing Guidelines allow for only probation only where – as here -- a sentence of 0 months is recommended or permissible.

### E.  ALTERNATIVE PENALITIES

The Court is authorized to substitute community service, a term of probation, and/or home detention of no more than the maximum allowed for incarceration.

### F.  FINE

The Court is authorized by the statutory offense to impose a fine of up to $5,000.

## VIII.   RECOMMENDED SENTENCING UNDER 18 USC 3553(a) FACTORS

Again, the Government notes in its March 4, 2022, letter:

> Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. 3553(a). Your client further understands that 40 U.S.C. § 5104(e)(2)(G) is a class B misdemeanor, as defined by 18 U.S.C. 3559(a)(7). Accordingly, pursuant to 1B19 of the United States Sentencing Commission, Guidelines Manual (2018), the sentencing guidelines do not apply to your client's sentencing.

The Court will consider the factors under 18 U.S.C.§ 3553(a) in crafting a sentence that is clearly at the low end of the sentencing range. As typically asserted by the USAO, these factors of that statute include:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed—

    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant;
and
(D)     to provide the defendant with needed educational or
vocational training, medical care, or other correctional treatment
in the most effective manner;

Yet "the offense" referred to in 18 U.S.C.§ 3553(a) here is 40 U.S.C. 5104(e)(2)(G)  of

"Parading, Demonstrating, or Picketing in a Capitol Building," and 18 U.S.C. 1752(a)(1) of entering

or remaining in a restricted area, temporarily restricted because of the presence of a Secret Service

protectee.  (This is not a permanently restricted location such as a nuclear intercontinental ballistic

missile base but only a temporary venue of a protectee.)

The USAO consistently wants to analyze "the nature and circumstances" of offenses which

Defendant Cruz did not commit, is not guilty of, and which form no part of what is currently before

the Court now.  The USAO wants the Court to sentence _other people_ who are not before this Court in

this case and smuggle into this case the misconduct of _other people_ not before the Court in this case.

The USAO consistently argues to sentence any given Defendant as if he had committed other crimes,

that other people committed.

a.  The "nature … of the offense" concerns "the offense" of 40 U.S.C. 5104(e)(2)(G)

"Parading, Demonstrating, or Picketing in a Capitol Building" and 18 U.S.C.

1752(a)(1), sounding in mere trespass.

b.  The "circumstance of the offense" concerns "the offense" of 40 U.S.C. 5104(e)(2)(G)

"Parading, Demonstrating, or Picketing in a Capitol Building" and 18 U.S.C.

1752(a)(1), sounding in mere trespass

c.  The need for the sentence imposed "to reflect the seriousness of the offense" concerns

"the offense" of 40 U.S.C. 5104(e)(2)(G)  "Parading, Demonstrating, or Picketing in a

Capitol Building" and 1752(a)(1), sounding in mere trespass.

d.   The need for the sentence imposed "to promote respect for the law," concerns "the offense" of 40 U.S.C. 5104(e)(2)(G)  "Parading, Demonstrating, or Picketing in a Capitol Building" and 18 U.S.C. 1752(a)(1) 1752(a)(1), sounding in mere trespass.

e.   The need for the sentence imposed "to provide just punishment for the offense," concerns "the offense" of 40 U.S.C. 5104(e)(2)(G)  "Parading, Demonstrating, or Picketing in a Capitol Building" and 1752(a)(1), sounding in mere trespass.

f.   The need for the sentence imposed "to promote respect for the law," concerns "the offense" of 40 U.S.C. 5104(e)(2)(G)  "Parading, Demonstrating, or Picketing in a Capitol Building" and 1752(a)(1), sounding in mere trespass.

g.   The need for the sentence imposed "to afford adequate deterrence to criminal conduct," concerns "the offense" of 40 U.S.C. 5104(e)(2)(G)  "Parading, Demonstrating, or Picketing in a Capitol Building" and 18 U.S.C. 1752(a)(1), sounding in mere trespass.

h.   The need for the sentence imposed "to protect the public from further crimes of the defendant," concerns "the offense" of 40 U.S.C. 5104(e)(2)(G)  "Parading, Demonstrating, or Picketing in a Capitol Building" and 18 U.S.C. 1752(a)(1), sounding in mere trespass.

The USAO cannot "smuggle" irrelevant issues into the case, of which the Defendant is not guilty and never will be guilty, until the end of time.

Indeed, to sentence Cruz as if he committed the very serious crimes charged against others of assaulting police officers, damaging federal property, and brawling with police or worse would actually – and actually does in fact – promote disrespect for the law.

Out of 10,000 demonstrators (as estimated by the U.S. Capitol Police), there are people who damaged Federal property.  Cruz, however, did not.

Out of 10,000 demonstrators, some people committed violence.  Cruz, however, did no such thing.

Out of 10,000 demonstrators, there are people who scuffled with police or worse, many even assaulting or battling with police officers.  Cruz, however, did not.

Out of 10,000 demonstrators, there are people who are charged with disrupting the Joint Session of Congress that recessed at 2:13 PM according to the testimony of then-Parliamentarian Wickham in *United States v. Stewart Rhodes, et al.* Case No. 1:22-cr-00015, on October 19, 2022, [4]and 2:00 PM according to the official after-action timeline report of the U.S. Capitol Police).  Cruz, however, did not.  Cruz entered an open door, apparently (given the fanciful names assigned in Congress) the Senate Wing Door, at 2:14 PM, about the time that the Congress was already going into recess at 2:13 PM.

The factors include consideration by the Court of "the Nature and Circumstance of the Offense" -- that is, parading, demonstrating, or picketing – which the Government asserts to include the following:

(1) Whether, when and how the Defendant entered the Capitol building.

Cruz entered what is apparently called the "Senate Wing Door" at about 2:14 PM, through an open door.

(2) Whether the Defendant encouraged violence.

No, Cruz did not.

---

[4]      The District of Columbia claims in *District of Columbia vs. Proud Boys International, LLC,* that it received a request from the U.S. Capitol Police at 12:58 PM for additional officers, indicating that the cause for the recess of the Capitol already existed prior to 12:58 PM.

(3) Whether the Defendant encouraged property destruction.

     No, Cruz did not.

(4) Defendants reaction to acts of violence or destruction.

     Cruz rejects that he is required to function as a law enforcement officer.  Cruz is not guilty of "guilty viewing" of other people's action.  The Defendant's reaction is not a valid factor.  Moreover, the Government's fixation on people's reaction to what other people did indicates the core problems in these cases.  Moreover, the meaning of this is unclear.  Is the Government suggesting that innocent members of the crowd were obligated to join in the melee and try to effect a citizen's arrest of the violent rioters, thus disrupting official law enforcement officers in the conduct of their duties?

(5) Whether, during or after the riot, the defendant destroyed evidence

     No, Cruz did not.  Indeed, again, when shown a photograph of the gray camoflouge Trump hat that the Agent believed Cruz was wearing on January 6, 2021, according to the FBI Special Agent, Cruz agreed that it was him in the photograph and that it was his hat and then stood up went to another part of his residence and came back with the actual hat.  Cruz showed the FBI Special Agent his matching hat.[5]

(6) The length of the Defendant's time inside of the building and exactly where the

---

[5]     The Government has been fixated on clothing which may seem strange to observers, but here the Agent explicitly portrayed it as evidence that it was him in photographs, even though Cruz had already admitted everything prior to that point.

defendant travelled.

The parties stipulated that Cruz was inside the Capitol for only 6 minutes.  Counsel rejects the idea that "exactly where the defendant travelled" is a factor the Court should consider, but only whether a defendant actually did something that is wrongful.  Merely travelling somewhere – differently from conduct – is not a relevant factor.  Cruz stipulated that he entered the Capitol when he should not have.  That is, Cruz stipulated that is conduct of being in the building was unlawful.  Cruz rejects that "guilty walking" is a proper element for the Court to consider.

Nevertheless, Cruz's pathway and very short time inside the Capitol building shows no pattern or plan or intention but just random meandering.

(7) The defendant's statements in person or on social media.

The Court would be violating the U.S. Constitution by considering such a factor, just as the Government has already violated the U.S. Constitution by asking the Court to consider it.  The thin line between many aspects of these cases and the First Amendment right to petition the government for redress of grievances and free speech should be a real concern to the Court with potential consequences far worse than anything that happened on January 6, 2021.  Here and in similar arguments and question the USAO tramples that line and endangers the Constitutional Republic far more than a few loud protestors a few of whom tangled with police.

(8) Whether the Defendant cooperated with, or ignored commands from police

officers.

It is undisputed that Cruz complied with police officers' directions.

(9) Whether the Defendant demonstrated sincere remorse or contrition.

Again, the Defendant on his own initiative volunteered to meet with and cooperate with the FBI in these matters. He searched for and handed over without a subpoena videos and photographs

## IX. WHAT THE COURT MAY NOT CONSIDER

By agreement with the Government after negotiation, Defendant Cruz stipulated only to 40 U.S.C. 5104(e)(2)(G)  "Parading, Demonstrating, or Picketing in a Capitol Building" and 18 U.S.C. 1752(a)(1).  **That is all that Cruz stands guilty of**.

The Government cannot now ask this Court to sentence him for something(s) entirely different, not what he stipulated to.

## X.  WHAT THE COURT MAY NOT CONSIDER:  FIRST AMENDMENT CONSTITUTIONALLY PROTECTED ACTIVITY

Defendant Cruz does not stand charged with Thought Crimes, unapproved thoughts, unauthorized political expressions, or socially undesirable political views.  He has not been called before the Orwellian Ministry of Truth.  Yet the Government has routinely asked this Court to punish Defendant for his exercise of free speech guaranteed to him by the First Amendment to the U.S. Constitution and the right to petition the government for redress of grievances.  In some cases, the USAO has in effect required January 6 Defendants to confess that "there are five lights" even if they are not convinced that the 2020 presidential election was the most perfect election in history.

It should be no concern of the USAO or the Court what opinions Defendants hold and it

25

would give confidence to the public for the Judiciary to be "as chaste as Caesar's wife" by

strenuously ignoring the public statements of any January 6 Defendant.

     The Supreme Court's decision in *West Virginia State Board of Education v. Barnette,* 319

U.S. 624 (1943) illustrates the compelled speech doctrine.  In now hallowed language in our national

laws, Justice Robert H. Jackson asserted,

> "If there is any fixed star in our constitutional constellation, it is that no
> official, high or petty, can prescribe what shall be orthodox in politics,
> nationalism, religion, or other matters of opinion or force citizens to
> confess by word or act their faith therein."

     Chief Justice John G. Roberts Jr. reiterated the essence of the compelled speech principle in

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc*., 547 U.S. 47 (2006):

> "Some of this Court's leading First Amendment precedents have
> established the principle that freedom of speech prohibits the
> government from telling people what they must say."

     This Court – even on a guilty plea – could not consider the race of a Defendant during

sentencing.  ***Neither*** can the Court consider the exercise of the Defendant's Constitutional rights of

free speech, petitioning the government for redress of grievances, free association, and travel.

     The Government's persistent, widespread, and persistent efforts to silence political opinions

different from those held by the U.S. Attorney and the Attorney General is far more disturbing and

dangerous to the country than anything that happened on January 6, 2021.

     Based on past treatment of January 6 Defendants, despite the good faith and cooperation

exhibited in reaching a stipulated trial in the case, Defendant and his counsel fear and expect a

bromide of irrelevant accusations of what other people did and inflammatory claims that the

Defendant holds divergent political views that the DoJ doesn't like.

     The "central meaning" of the First Amendment, Justice William Brennan declared in his

opinion for a unanimous Court, **is the right to criticize government and public officials.**  *New York Times v. Sullivan* 376 U.S. 254 (1964).

## XI. WHAT THE COURT MAY NOT CONSIDER:  CROWD LIABILITY

Hundreds of people out of the crowd of 10,000 committed violence against people and things, battled with police, injured about 140 police officers, damaged federal property at the Capitol, and some even tried to break through the doors to the Senate and House chambers.

However, here, in this case, the security camera video – that is, the Government's own evidence – shows with unmistakable clarity and precision that most of those who intruded into the U.S. Capitol building clearly had no plans whatsoever, no sense of direction, no commonality, etc. [6]

Crowds do not do things.  Individuals do things.  Crowds do not.

> This is where things fall apart. Although both Governor DeSantis and Sheriff Williams argue that the phrase "willfully participate" is commonly understood, neither party offers an actual definition. Is it enough to stand passively near violence? What if you continue protesting when violence erupts? What if that protest merely involves standing with a sign while others fight around you? Does it depend on whether your sign expresses a message that is pro- or anti-law enforcement? What about filming the violence? What if you are in the process of leaving the disturbance and give a rioter a bottle of water to wash tear gas from their eyes?

> The Governor would have this Court pencil in an exception for a person who merely "attend[s]" a violent demonstration but does not actively engage in violence or conduct that poses an imminent risk of injury or property damage. ECF No. 99 at 13. But the Governor offers no explanation or construction that limits when mere attendance becomes participation, except that a person must "intend to commit violence." Id. But this ignores the plain text of the statute, which separates a person from an assembly of three or more persons sharing that intent. See *infra.*

---

[6]    *See,* Capitol Security camera video, produced by USAO as 7029 USCS 02 Rotunda Door Interior-2021-01-06_15h15min01s000ms.mp4 from USCP OPR Report 21-007, Exhibit 6 CCTV Recordings, from production DT_DocID: USCP-003-00000167, produced 11/18/2021, in Global Production DOJCB_008

*See, The Dream Defenders, et al., v. Ron DeSantis, 21-cv-191, ECF No. 137 (N.D. Fla. Sept. 9, 2021), (Mark E. Walker, Chief United States District Judge),* Page 53 *(injunction against anti-riot law in part because the legislation appeared to criminalize the defendant's protest activities even if he did not participate in the violent acts of others)*, attached as **Exhibit**.  And continuing:

> If this Court does not enjoin the statute's enforcement, ***the lawless actions of a few rogue individuals could effectively criminalize the protected speech of hundreds, if not thousands, of law-abiding Floridians***. This violates the First Amendment. See, e.g., *Bible Believers v. Wayne Cnty.*, Mich., 805 F.3d 228, 252 (6th Cir. 2015). Florida's interest in preventing public violence is beyond question, but when that interest collides with rights guaranteed by the First Amendment, the "government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. Otherwise, those rights, which "are delicate and vulnerable, as well as supremely precious in our society," may be suffocated. Id. Section 870.01(2), through its ambiguity, chills speech and eviscerates that essential breathing space. The law is overbroad.[27]

> Accordingly, I conclude that Plaintiffs have established a substantial likelihood of success on the merits as to their overbreadth claim.

*Id.,* at Page 77 *(emphases added)*.

No U.S. citizen can be guilty of the "context" of what other people did.  The careless transfer of the actions of "crowds" or "others" to specific defendants is an attack upon Due Process and the burden of proof of proving the elements of a crime beyond a reasonable doubt.

If the Government could allege a conspiracy, it would have done so.  But it did not.  And now it never can.  So Cruz is not responsible for other people, particularly those he never met.

## XII.   "GUILTY VIEWING" OF THE CRIMES OF OTHERS

Apparently generated by a misunderstanding of a split decision among Defendants, the Government has become enamored of accusing January 6 Defendants of what Defendants' counsel will call "guilty viewing" or "guilty watching" of other people committing a crime.  But one does not become guilty by seeing someone else do something criminal.

On April 6, 2022, the Honorable District Court Judge Trevor McFadden provided a very

interesting split decision, including in *United States v. Matthew Martin*, Case No. 1:21-cr-00394, in this District.  Judge McFadden found Matthew Martin not guilty because the U.S. Capitol Police had not given notice to the public of a restricted area under 18 U.S.C. 1752(a)(1) (that is, notice that had been posted on flimsy 11 inch by 14 inch paper was no longer visible after efforts by some to remove barricades) and police officers did not express any discouragement of Martin entering the Capitol.

But McFadden found another Defendant had crawled over walls and other obstructions to enter the Capitol.  Thus, Judge McFadden found, the second co-Defendant did not need to see signs posted to realize that he was not supposed to be entering the building, if he had to crawl over walls to do it.  The split decision strongly reveals the legal test that is important.

18 U.S.C. 1752(a)(1) is explicitly conditional upon the requirement of "knowingly."  The DoJ seems to want to look away from this word "knowingly" with an intense aversion. McFadden analyzed that even without seeing the signs no longer present, the Defendant who crawled over walls and dodged police to enter the Capitol had sufficient notice that the area was restricted.

However, the Government has stretched or misunderstood Judge McFadden's rulings.  It was not that police were present.  It was not that a few were committing crimes.  One is perfectly free to stand across the street and videotape crooks robbing a liquor store.  McFadden did not find any duty to depart.  It was not about hearing a fire alarm.  Anyone who has attended school knows that someone can falsely pull a fire alarm handle to be disruptive when there is no actual emergency.

Demonstrators are free to assume that those who are breaking the law will be dealt with while the overwhelming majority of demonstrators may continue to exercise their rights.

Ever since, the Government has been fixated on the claim that Defendants saw some people rioting.  That is not what McFadden decided, however.  McFadden's analysis did not turn on "guilty watching" of others rioting.  It had nothing to do with seeing police.  It had nothing to do with hearing

an alarm sounding.  It was about the requirement for trespass to include a warning.

Seeing guilt does not create guilt.  Seeing people brawling would lead a reasonable person to conclude that those people will be arrested and the remainder of the crowd may continue to demonstrate.

Indeed, ironically, the DoJ, the political class, the news media, etc. accuse certain groups of being "militia" and "vigilantes" yet know find guilt by demonstrators for _not_ taking the law into their own hands and deputizing themselves as police – or else turning around and leaving (certainly the wiser course of action, but not legally required).  Those who see the law being broken, and see that there are law enforcement present so there is no need to tell law enforcement about it, have no duty to leave the area.  The mere fact that some people are breaking the law does not mean that the area is restricted.

### XIII.   COURT MAY NOT CONSIDER FACTS DISPUTED OR CRIMES NOT CHARGED

Unfortunately, the USAO has shown a pattern in sentencing proceedings to try to accuse Defendants of additional crimes for which they have not been found guilty and argue facts not proven and legal conclusions not agreed to by the Court.

Cruz, by counsel, appreciates the role of context in certain considerations by the Court.  But this is not that.  The tendency by the USAO has been to argue ***_disputed_*** facts left ***_unresolved._***.  The Court would have to hold an evidentiary hearing of disputed and unresolved facts before applying any such factual allegations here.

Here, the terms possibly might not raise a bar of double-jeopardy, the practical challenge of proving any other crime beyond a reasonable doubt would be daunting in the future.

Therefore, Defendant Cruz remains "innocent until proven guilty" of any other crime and will

never be charged again with, prosecuted, or ever convicted of any other crime arising out of the events of January 4-6, 2021, in the District of Columbia.  Thus, standing now before the Court Cruz is officially not guilty of any of the charges but Counts I and II until the end of time.

## XIV.   FACTUAL CIRCUMSTANCES – DARKLY MISCHARACTERIZING THE CAPITOL

To set up its sentencing argument, the Government typically seeks to set up the issues to be decided here with misinformation.  The Government attempts to present these matters as if the U.S. Capitol is a secret, underground, nuclear missile base, rather than a citadel of democracy – meaning the meeting place between citizens and their elected representatives.

Of course, there is no excuse for political violence, such as witnessed since 1999 and especially from 2014 through 2020, and especially directed against law enforcement.  In the 1960s, leftist demonstrators actually set off a bomb inside the U.S. Capitol.

Neither is there any excuse to refuse to distinguish between those who committed violence on January 6 in or near the Capitol ***and those who did not.***

The U.S. Capitol and its massive Grounds – a public, national park – are presumptively and normally open to the public, and have traditionally been the site for well over a century of many small and large public demonstrations exercising the right of free speech and the right to petition the government for the redress of grievances as is the right of all citizens guaranteed by the First Amendment to the U.S. Constitution.

As Federal courts in this District have reasoned in reaching legal conclusions:

> ***The Capitol Grounds*** (excluding such places as the Senate and House floors, committee rooms, etc.) ***have traditionally been open to the public***; indeed, thousands of people visit them each year. Thus, we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) *(emphases added)*.

> The courts in this jurisdiction have long recognized that **"[t]he United States Capitol is a unique situs for demonstration activity"** and **"is a place traditionally open to the public thousands visit each year to which access cannot be denied broadly or absolutely,** [a fact which must be weighed] against the government's interest in protecting against possible `damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.'" *Kroll v. United States*, 590 F. Supp. 1282, 1289, 1290 (D.D.C.1983) *(quoting Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 583-85 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S. Ct. 311, 34 L. Ed. 2d 236 (1972)).

*Wheelock v. United States* 552 A.2d 503, 506 (D.C. 1988) *(emphases added)*.

So very public is the Capitol, that built into the physical building from its initial construction are public viewing galleries allowing any member of the public – for no reason other than a desire to watch their Representatives and Senators at work – may sit and watch the House of Representatives and the U.S. Senate while in session. [7]

There is no physical barrier – even to this day – between the Chambers in session and the public watching from the balcony galleries.  If a member of the public wished to – not advisable, of course – toss a candy bar down to his willing U.S. Senator, the physical structure of the Senate chambers would make that possible.

No greater message of the very public nature of the Capitol can be found than the very architecture of the building designed as a meeting place between citizens and their leaders.

---

[7]    See:  Large Public Galleries in New Legislative Chambers, Library of Congress exhibit, **https://www.loc.gov/exhibits/uscapitol/s5.html** :  Thomas U. Walter. "Details of Gallery in Hall of Representatives," 1856. Ink and water color on paper. Architect of the Capitol (204)

[8]    This is changed only in the sheer quantity of citizens in our growing nation and the number of persons who want to watch from the viewing galleries, leading to time limits for rationing.  But the public purpose of the U.S. Capitol has been set since the first construction blueprints were drawn.

The Government persistently diverts attention with its claim that the Capitol is "secured" 24 hours a day, 7 days a week.  However, "secured" does not mean "closed."

The museums of the Smithsonian Institution are "secured 24 hours a day, 7 days a week" yet open to tourists from around the world in the millions, subject to the protection of its Office of Protection Services, during business hours.  Indeed, welcoming the public is their purpose.

Not only are the Capitol Grounds a national park, but the Capitol building is in fact a museum in which hangs some of our nation's most iconic and important historic art, such as the nation's historic paintings[9] of the --

- **Signing of the Declaration of Independence**
- **Surrender of General Burgoyne**
- **Surrender of Lord Cornwallis**
- **General George Washington Resigning his Commission**
- **Landing of Columbus**
- **Discovery of the Mississippi**
- **Baptism of Pocahontas**
- **Embarkation of the Pilgrims**

The Capitol building is 751 feet long, [10] and the size of a small ocean-going cruise ship.  The Congress routinely conducts its business with hundreds of (maybe a thousand) journalists, visitors – even tours of school children (not always known to be quiet) – lobbyists, government officials, etc. present in the building while committee hearings are held, each House is in session, meetings are held throughout the building, etc.  The Government would have us imagine that the mere presence of any member of the public in the 751-foot-long building is a debilitating crisis, overlooking the hundreds of visitors who are present in the U.S. Capitol at all times, every hour of every business day.

In addition to being buffaloed into assuming that "secured" means "closed," we are lectured that there are permanent security barriers.  Unfortunately, there were not on January 6, 2021.

---

[9]    **https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/rotunda**
[10]    Architect of the Capitol, **https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building**

XV.   **AVOIDING UNDUE DISPARITIES IN SENTENCING:  COMPARISONS:  WHAT ARE NORMAL PUNISHMENTS FOR COMPARABLE BEHAVIOR?**

   **A.  DISPARITIES WITH 2017 TRUMP INAUGURAL RIOTS**

Based upon comparable events in recent memory, to avoid sentencing disparities, the Court should drop all the charges as the DoJ did after the massive insurrection, arson, and riots held on January 19-21, 2017, to protest the inauguration of Donald Trump as President.

In January 2017, across the nation, an estimated 2.6 million Left-wing and anarchist protestors demonstrated their fury at former Democrat Donald Trump.   In the District of Columbia, several thousand of those demonstrators engaged in arson, assaults on police, vandalism, and rioting, including burning hundreds of cars and businesses with Molotov cocktails.



Some stores were boarded up for months afterwards.  Yet the DoJ dropped the charges against these violent rioters and insurrectionists.

   **B.  DISPARITIES WITH 2018 ANTI-KAVANAUGH RIOTS**

Based upon comparable events in recent memory, the Court should assess a $50 fine upon Defendant Cruz as the DoJ did just recently in September 2018, when anti-Kavanaugh protestors publicly and openly conspired to obstruct the official proceedings of the U.S. Senate Judiciary Committee in an attempt to prevent the confirmation of Brent Kavanaugh to the U.S. Supreme Court. The rioters inside the U.S. Senate Judiciary Committee hearing room and occupying the Hart Senate Office Building were released within hours on a $50 bail bond.  Then the charges were dropped

against most of the rioters.

### C. DISPARITIES WITH 2020 ANTI-TRUMP RIOTS ATTACKING THE WHITE HOUSE

Based upon comparable events in recent memory, the Court should drop the charges and award large financial windfalls to Defendant Cruz, as the DoJ did with the insurrection, arson, riots, and attack on the White House in May and June 2020.  The charges were dropped against most of the rioters, and they were paid large sums in settlement of their lawsuits.

In 2011, similarly, Left-wing rioters entered and physically occupied the Wisconsin State legislature, followed by months of disruptive protests mostly outside but also inside the Capitol building of Wisconsin.[11]  Those who sought to obstruct official proceedings to prevent the passage of legislation they disapproved of were mostly not arrested or given minor fines or probation.

Dated:  April 26, 2023

RESPECTFULLY SUBMITTED
LLOYD CASIMIRO CRUZ, JR.,
*By Counsel*

*John M. Pierce*

John M. Pierce, Esq.

John Pierce Law Firm
21550 Oxnard Street
3rd Floor, PMB #172
Woodland Hills, CA 91367
Tel: (213) 400-0725
Email: *jpierce@johnpiercelaw.com*
Attorney for Defendant

---

[11]     "Thousands storm Capitol as GOP takes action," Wisconsin State Journal, March 10, 2011, updated February 19, 2015, ("Thousands of protesters rushed to the state Capitol Wednesday night, forcing their way through doors, crawling through windows and jamming corridors"), accessible at: **https://madison.com/wsj/news/local/govt-and-politics/thousands-storm-capitol-as-gop-takes-action/article_260247e0-4ac4-11e0-bfa9-001cc4c03286.html**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document is being filed on this April 26, 2023, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants.  From my review of the PACER account for this case the following attorneys are enrolled to receive notice and a copy through the ECF system.

Andrew J. Tessman, Esq.
Assistant U.S. Attorney
300 Virginia Street East
Suite 4000
Charleston, WV 25301
304-340-2234
**andrew.tessman@usdoj.gov**

Rebekah Lederer, Esq.
Assistant U.S. Attorney
601 D Street NW
Washington, DC 20001
202-252-7012
**rebekah.lederer@usdoj.gov**

_____
John M. Pierce, Esq.