```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,
                                        Criminal Action
 4              Plaintiff,              No. 1: 22-64

 5         vs.                          Washington, DC
                                        May 2, 2023
 6    LLOYD CASIMIRO CRUZ, JR.,
                                        9:08 a.m.
 7              Defendant.
      _____/
 8

 9                 TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE REGGIE WALTON
10                UNITED STATES DISTRICT JUDGE

11
      APPEARANCES:
12
      For the Plaintiff:       ANDREW TESSMAN
13                             DOJ-USAO
                               300 Virginia Street East, Ste 4000
14                             Charleston, WV 25301

15                             REBEKAH LEDERER
                               USAO
16                             Criminal
                               601 D Street NW
17                             Washington, DC 20001

18    For the Defendant:       JOHN M. PIERCE
                               JOHN PIERCE LAW, PC
19                             21550 Oxnard Street
                               Suite 3rd Floor OMB #172
20                             Woodland Hills, CA 91367

21    For US Probation         AMI LANDON

22
      Court Reporter:          SHERRY LINDSAY
23                             Official Court Reporter
                               U.S. District & Bankruptcy Courts
24                             333 Constitution Avenue, NW
                               Room 6710
25                             Washington, DC 20001
```

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, this is criminal
 3    matter 22-64, United States of America versus Lloyd Casimiro
 4    Cruz, Jr.
 5            May I have counsel and probation approach the lectern
 6    and state your appearance for the record, beginning with the
 7    government.
 8            MR. TESSMAN:  Good morning, Your Honor, Andrew
 9    Tessman and Rebecca Lederer for the United States.
10            THE COURT:  Good morning.
11            MR. PIERCE:  Good morning, Your Honor.  John Pierce
12    on behalf of defendant Lloyd Cruz.
13            THE COURT:  Good morning.
14            MS. LANDON:  Good morning, Your Honor.  Ami Landon on
15    behalf of US Probation.
16            THE COURT:  Good morning.  In preparation for the
17    sentencing, I did review the superseding information again,
18    also the statement of offense that was filed by the government,
19    also the presentence investigation report, also the probation
20    department sentencing recommendation, also the government's
21    sentencing memorandum, also the defendant's sentencing
22    memorandum and then the government's response to that
23    sentencing memorandum and then also a report from the Pretrial
24    Services Agency.  Is there anything else I should have reviewed
25    in preparation for the sentencing, Government Counsel?
```

1           MR. TESSMAN:  Your Honor, last week we submitted a

2    drive with, I believe, 10 videos.

3           THE COURT:  I have not looked at them, because I am

4    in trial.

5           MR. TESSMAN:  That is fine, Your Honor.

6           THE COURT:  I am have been too busy.  But my law

7    clerk did review them and did outline for me what is in them.

8    To the extent you want to play them, that is fine.

9           MR. TESSMAN:  Okay.  Thank you, Your Honor.

10          MR. PIERCE:  Nothing from the defense.

11          THE COURT:  Very well.  I saw that the government did

12   not have any objections to the report; is that right?

13          MR. TESSMAN:  That is correct, Your Honor.

14          THE COURT:  Or the guideline calculations?

15          MR. TESSMAN:  That is correct.

16          THE COURT:  The defense had not -- by the time the

17   probation department submitted the report to me, had not raised

18   any objections but I understand now there are some objections

19   to the report or the guideline calculations; is that right?

20          MR. PIERCE:  Just what is set forth in the

21   defendant's sentencing memorandum, Your Honor.

22          THE COURT:  Well, I don't know if probation has had

23   an opportunity to review those, have you?

24          MS. LANDON:  Your Honor, we have.  And we stand by

25   what is noted in the presentence report that are the applicable

1    guidelines in this case, and for that matter, in other cases

2    similarly situated in this courthouse that the probation office

3    has applied the same guidelines.

4          THE COURT:  I will hear from the defense regarding

5    the specific challenges you are making to how the probation

6    department has calculated the guidelines so I can make a ruling

7    on the record as to whether I agree with your position or agree

8    with probation.

9          MR. PIERCE:  So really nothing detailed to add.

10         THE COURT:  Are you fully vaccinated or not?  No?

11         MR. PIERCE:  I am not, Your Honor.

12         THE COURT:  Keep it on then.

13         MR. PIERCE:  So really nothing specific to add in

14    addition to what we set forth in the sentencing memorandum.

15    Essentially we are taking issue with some of the convictions we

16    think are, you know, enough in the past that they shouldn't be

17    counted and whatnot.

18         THE COURT:  Which ones are you referencing and in

19    reference to those what legal authority do you have in support

20    of the probation department having inappropriately considered

21    those?

22         MR. PIERCE:  It would be just what is set forth in

23    the sentencing memorandum, Your Honor.  We don't have anything

24    else to add right now.

25         THE COURT:  Very well.  Anything else?

1           MR. PIERCE:  No, Your Honor.

2           THE COURT:  Government, anything?

3           MS. LEDERER:  Your Honor, I am vaccinated.  May I?

4       Thank you.

5           Your Honor, we agree with probation's calculations

6       and referring the Court to page 113 of the sentencing

7       guidelines, which covers trespassing, the base level is 4.

8       There is the adjustment for a restricted building or grounds.

9       When you go to the definitions, it refers you back to 1752 that

10      defines restricted building or grounds.

11          For the criminal history that counsel brought up,

12      again probation did properly calculate a criminal history level

13      of 5.  And that is based off of the fact that the defendant had

14      his parole revoked in 2007.  If you look at the definitions

15      under the section that governs the applicable time period, it

16      is a 15-year look back from the commencement of the criminal

17      offense which would be January of 2001.  So the revocation in

18      2007 that lasted until parole was terminated in 2013 is

19      applicable here.

20          THE COURT:  Very well.  You know, I have considered

21      the objections that have been raised by the defense and the

22      position that the probation department has taken.  And I would

23      have to agree that the probation department's assessment as to

24      what the guideline is is the accurate reflection of what the

25      guidelines require.  And accordingly, I would reject the

1    defense objection to the probation department's calculation and

2    would conclude that those calculations as determined by the

3    probation department are, in fact, correct.  With that, I'd

4    adopt the presentence report, both the report report itself and

5    the guidelines contained within the report.

6            Any allocution from government counsel?

7            MR. TESSMAN:  Your Honor, I am also fully vaccinated.

8            Your Honor, we have set forth our sentencing position

9    and our sentencing memorandum.  But we would like to address

10   the Court briefly on a few of the sentencing factors.  First,

11   I'd like to address the nature of the circumstances of the

12   offense.  Generally, January 6 was an unprecedented event in

13   our history.  For the first time ever, our Capitol was attacked

14   by a group of people who were upset about the results of

15   political election.  And this attack was an attack on not only

16   the building itself, but on the values upon which this nation

17   stands.  It was an attack on democracy.

18           The violent mob found strength in numbers.  And this

19   mob outnumbered police.  And each person who was a part of that

20   mob was a valuable piece that allowed violence and property

21   destruction to occur that day.  The criminal acts that occurred

22   on January 6, 2021 are truly reprehensible acts.  And like I

23   said, Your Honor, for the first time ever, the peaceful

24   transfer of power was threatened in this country.  It was a

25   serious day in our history.  And it is generally the most

1    serious type of offense that will come before us.

2            With respect to this defendant -- these cases can be

3    a little bit tricky, because earlier in that day, there was a

4    political rally.  And Mr. Cruz was at that political rally.

5    And we agree with the defendant, there is nothing wrong with

6    attending a political rally.  That is his First Amendment

7    right.  Later in that day, however, a riot occurred at the

8    Capitol.  And that is where it goes from protected First

9    Amendment conduct to something else.  And it is not always easy

10   to distinguish where that line is.  But in this case, it is not

11   that difficult.  And it is not that difficult because the

12   defendant recorded his time at the US Capitol grounds that day.

13   He recorded it on his personal GoPro.  And with the Court's

14   permission, I would like to play three of the videos that will

15   last less than 15 minutes, Your Honor.

16           THE COURT:  Very well.

17           MR. TESSMAN:  May I do that from counsel table?

18           Thank you.

19           (Video played.)

20           MR. TESSMAN:  Your Honor --

21           THE COURT:  Be careful with it, we don't have money

22   to replace it.

23           MR. TESSMAN:  I'm sorry about that, Your Honor.

24           The first exhibit we are going to play is Exhibit 3.

25   And it is 8 minutes long.  It starts at approximately 2:06 p.m.

1    It starts when Mr. Cruz is already on the lower west terrace.

2    He is near the front line of officers who are wearing riot

3    gear.  In this video, he is witnessing crowd control measures

4    such as flash bangs and the use of tear gas.  And we just

5    wanted to point out that while you are watching this video that

6    at any point, Mr. Cruz could have turned around and went home.

7    But at all points he made the conscious and deliberate decision

8    to go forward with the mob into the Capitol.  We also would

9    like the Court to observe -- watch out for barricades and signs

10   that -- which show that the Capitol grounds are closed.

11   Because to this day, Mr. Cruz has told anyone who will listen

12   that he saw no signs that the Capitol was was closed that day.

13   And he essentially just went into the Capitol and came out.

14          Towards the end of the video, you will see Mr. Cruz

15   is following someone carrying a baseball bat inside the

16   Capitol.  At the end of the video, you will also hear an

17   audible alarm at the fire door that was breached that Mr. Cruz

18   enters.  You will also hear Mr. Cruz say before he goes into

19   the Capitol, "We broke through the gates.  I am going inside.

20   They broke through the window."

21          (Video played.)

22          MR. TESSMAN:  The audio is not picking up.

23          THE COURTROOM DEPUTY:  You need the speaker.

24          MR. TESSMAN:  Thank you.

25          THE COURT:  You said this was recorded by Mr. Cruz

1    himself?

2         MR. TESSMAN:  This was recorded on the Capitol

3    grounds by Mr. Cruz with his personal GoPro camera.

4         It is still not playing audio.

5         THE COURTROOM DEPUTY:  Do you have it on the right

6    setting on your laptop, like speaker?

7         (Video played.)

8         MR. TESSMAN:  Your Honor, the next video we are going

9    to play is Exhibit 4.  It is right after Mr. Cruz enters the

10   building.  He is continuing to record on his GoPro camera.

11   This is the way that Mr. Cruz provided the videos to the FBI,

12   but we have not cut them or anything.  But I just wanted to

13   make that clear to the Court.  This video will show Mr. Cruz

14   moving toward the north side of the building toward the senate

15   chamber.  He then turns around and walks with the mob back

16   south.  During this video, you can see obvious signs of

17   commotion inside the building including smoke.  He turns around

18   and walks back to the south side of the building.  As he does,

19   he passes the door that he entered, the senate wing door.  And

20   you can hear the alarm as he passes that door.

21        (Video played.)

22        MR. TESSMAN:  Your Honor, the last video we are going

23   to play is Exhibit 5.  It is 5 minutes long, starts at

24   2:16 p.m.  It shows Mr. Cruz moving through with the mob

25   through the halls of the Capitol to the crypt area of the

1    Capitol.  And once he arrives, the video is kind of dark at

2    first.  But when the light starts to -- when the video starts

3    to light up, you can see an object being thrown by rioters at

4    the police line.  Nevertheless, Mr. Cruz did not turn around.

5    He stays with the mob and looks for a way around that police

6    line in the crypt.

7              I will play that video now.

8              (Video played.)

9              MR. TESSMAN:  Your Honor, those are the nature and

10   circumstances of the offense as to this defendant.  As to the

11   history and characteristics of this defendant, as you know, he

12   has multiple felony convictions, which puts him in a criminal

13   history category 5.  His sentencing range is 9 to 15 months.

14   We are asking for midrange sentence of 12 months.  Our

15   recommendation is primarily driven by specific deterrence.

16             Your Honor, the mark of a recidivist is someone who

17   doesn't appreciate what he did wrong.  And in this case, Mr.

18   Cruz has been unable to come to terms with his own conduct.  He

19   has repeatedly stated that he did nothing wrong, he just walked

20   to the Capitol and walked out the door.  Those videos that we

21   just watched tell a different story.

22             He wants to believe that he is the victim in this

23   case, but he is here as a consequence of his own actions.  He

24   only has himself to blame for where he is at.  We believe he is

25   likely to engage in this type of conduct again based on his

1  statements about this case.  Therefore, we believe that a

2  sentence of incarceration is necessary in this case for

3  specific deterrence.

4          With that, Your Honor, do you have any questions for

5  us?

6          THE COURT:  You said the sentencing guideline is 9 to

7  15 months.  That, in fact, would be the case if the maximum

8  sentence was more than one year.  Probation says the guideline

9  says the most he could be sentenced would be 12 months on Count

10  1 is that the guideline range is actually 9 to 12 months.

11          MR. TESSMAN:  That is correct as to Count 1.

12  Mr. Cruz is convicted of two offenses in this case.  So he has

13  been convicted 5104(e)(2)(G) which carries a 6 month sentence.

14  You could sentence him with a concurrent sentence to a maximum

15  of 18.

16          THE COURT:  You mean consecutive?

17          MR. TESSMAN:  Consecutive, that is what I meant.

18          THE COURT:  The probation department says that the

19  guideline doesn't apply to the 6-month sentence.  And therefore

20  concludes that the guideline is 9 to 12 months as compared to 9

21  to 15 months, even though technically you are right, a

22  consecutive sentence could be imposed that would result in a

23  sentence above 12 months.

24          MR. TESSMAN:  Correct, Your Honor.  I think the issue

25  is the G count, the parading count, is a class B misdemeanor.

1    Therefore the guidelines don't apply to it.  So the guidelines

2    do apply to the other count.  And the maximum sentence is 12

3    months, so we agree with that.

4         Thank you, Your Honor.

5         THE COURT:  Okay.  I would conclude, even though the

6    government says the guideline is 9 to 15 months, I would

7    conclude that probation is correct, that the guideline is 9 to

8    12 months because of the maximum sentence that can be imposed

9    in reference to the offense that the guideline is applicable

10    to.

11         MR. TESSMAN:  Sure.

12         THE COURT:  Defense.

13         MR. PIERCE:  Your Honor, I am going to be very brief.

14    But Mr. Cruz has asked to speak at some length and he really

15    needs to use the restroom for a --

16         THE COURT:  We'll take a short break.

17         THE COURTROOM DEPUTY:  All rise.

18         (Recess taken.)

19         THE COURT:  You may be seated.

20         MR. PIERCE:  Your Honor, I am going to be very brief.

21    Mr. Cruz does want to speak and at some length, respectfully,

22    to the Court.  Your Honor, the facts here are what they are.

23    He is not contesting any of the facts in the statement of

24    offense.  He stipulated to those at trial.  What I would really

25    like to kind of focus on is exactly what Mr. Cruz did and did

1    not do that day.  Fundamentally, he came to DC.  He did have

2    strong feelings about some issues in the election.  He has

3    those today.  He is not walking away from those.  But he came

4    to DC fundamentally to have his voice heard.  He did not come

5    there to hurt anyone.  He did not hurt anyone.  He did not come

6    there to damage any property.  He didn't damage any property.

7    He came there to go to, you know, a political rally.  A lot of

8    folks ended up going down to the Capitol.  He went down there

9    as well.  And he followed folks into the building.

10          He was only in the building for I think it is

11   approximately 6 minutes.  I would respectfully submit, Your

12   Honor, that on the range of things that happened on January 6,

13   on that day, that this is on the sort of lower end with respect

14   to the nature of his conduct.

15          Mr. Cruz -- the consequences for Mr. Cruz are going

16   to be really very, very devastating to the extent he has a

17   significant prison time.  He has four children at home,

18   actually I think now he has actually 9 at his house right now

19   that he is taking care of.  He has no one to take care of his

20   kids, because his wife -- he is on Social Security disability

21   benefits.  His wife -- there is no one to watch the kids if

22   she -- she is going to have to work.  That is going to be a

23   huge issue.  He had a very, very rough childhood.  He did have

24   problems with the law when he was younger.  He turned his life

25   around.  He has been a very productive, you know, family

1   person.  He is someone that loves his country and he is not

2   going to go in the Capitol again on January 6, that is for

3   sure.  So I don't think that specific deterrence here really

4   requires a lengthy prison sentence.  We would respectfully ask

5   for 1 to 2 years probation and a relatively moderate fine.

6            If this man goes to prison for a significant period

7   of time, it is going to have devastating effects on his family,

8   primarily a lot of children.  So we would ask the Court to

9   consider the fact that he was just in the Capitol for 6

10  minutes.  He didn't hurt anybody and he didn't damage any

11  property.  And the defendant would like to address the Court.

12            THE COURT:  What does the wife do?

13            THE DEFENDANT:  Cashier at Family Dollar -- Dollar

14  Tree.

15            MR. PIERCE:  She is a cashier at Dollar Tree, Your

16  Honor.  And so, again, I am going to let the defendant talk at

17  some length to the court.  But he has serious -- the other

18  thing I want to mention is he has very serious medical issues.

19  He has very significant mental health issues as well.  I think,

20  if anything, the best course of action would be to ensure he

21  has got the right treatment for these things.  He can be on,

22  you know, supervised release.  He can be on home detention.  It

23  is going to blow up his family and these children if he goes to

24  jail for a significant period of time.  But the defendant would

25  like to address the Court, if that is okay, Your Honor,

1   directly.

2                    THE COURT:  Very well.

3                    THE DEFENDANT:  Your Honor, I have publicly announced

4   that I went into the Capitol, that I did apologize for going in

5   there.  I admit that I did wrong.  That I teach my kids

6   constantly that you have to man up for what you do.  That I did

7   go in there.  That what I was thinking that I was not sure.  I

8   was just going with the flow.  That, since then my wife, she

9   has literally banned me from going and doing anything without

10  checking with her first.  That basically is a prison right

11  there.  I'm sorry.  That I try to make jokes when -- during the

12  hardest times because --

13                   All right.  During my childhood, I lived a rough

14  life, beatings every day, single mother.  And I swore I

15  wouldn't be that way.  I have four kids.  We -- I took my

16  nephew in because he was getting in trouble with the law.  I

17  don't tolerate drugs around my house.  I never came up hot for

18  any drugs when it came to the probation services.  My probation

19  officer -- presentence probation officer said I was doing

20  really good.  I did my check-ins and everything.  That I have

21  drug test kits in my garage because I don't allow any drugs or

22  anything around my property.  I lived a hard life.

23                   And, yes, I was young, stupid when I got in trouble

24  and I swore I would straighten my life up.  I gave my word to

25  that judge that I would make sure that I straightened my life

1    up.  Ever since then I try to do everything I can to make sure

2    I obey the laws.  That, yes, I have some speeding tickets but,

3    yes, I make sure I do everything I possibly can.

4         I want to make sure that when it comes to my kids and

5    the kids I mentor that I try to teach them when they do

6    something wrong, they have to man up for it.  Right now my son

7    that is supposed to be helping out my wife, my oldest one.

8    That he just got out of the hospital after being in there for a

9    week.  His kidneys are shutting down.  They don't know what is

10   going on with it.  My wife is going through a lot right now

11   that I don't know what else I can do.  I understand that I need

12   to be punished for going there.  That it is hard for me to

13   remember what actually happened that day.  That a long time ago

14   I got beat with a metal bat and there is a lot of key things in

15   my life that I keep forgetting.  That is why I walk around and

16   record everything.  It helps to bring back when I need to try

17   to recall something, it helps bring it back.

18        All I remember doing that day is just walking around.

19   Going through an open door.  I don't remember what the inside

20   even looks like.  That when I gave the footage to the FBI, that

21   was all that I had.  I have little bits like from the crowd and

22   whatnot, but the thing is I don't have any footage on the

23   inside, so I don't have no clue what it looks like.  I don't

24   remember the sounds.  The noise just from watching that right

25   there, that is why I haven't watched the footage that I took a

1    long time ago.  That is why I haven't done it for the past two

2    years that since I have been charged and everything.  That

3    literally, it has been hell.  I have received hate mail.  My

4    entire family disowned me.  I have lost friends.  My wife lost

5    friends.  My kids lost friends.  A few weeks ago, it was my

6    twins' birthday party.  We tried to have a birthday party, no

7    one showed up.  We became the outcasts of the community.  I

8    still try to help out in the community where I can.  I go mow

9    grass, I try to do what I can to help out.  But yet, this right

10   here, has completely destroyed my life.  I can't -- I can't

11   keep putting my kids through this stuff.  I have got five kids

12   at home and then I have four more that my sister-in-law just

13   moved out there.  Because she was in an abusive relationship.

14           I don't -- I am not a violent person.  I don't like

15   violence.  Watching the videos right there that -- I walked

16   around.  I was narrating.  Why?  I don't know.

17           THE COURT:  Are you saying you didn't realize what

18   you were doing?  You didn't appreciate what you were doing that

19   day?

20           THE DEFENDANT:  When I look back now then, it -- it

21   sickens me to my stomach.

22           THE COURT:  But are you saying that on that day you

23   did not realize what you were doing you, did not appreciate

24   what you were doing?

25           THE DEFENDANT:  When I went to the rally, you know,

1    that I was there because love and support.  When I went to the

2    Capitol that -- I was walking around that.  I don't -- I know

3    that -- I am trying to think of the word.

4             THE COURT:  Did you not see the police coming under

5    attack by other people that you were with?

6             THE DEFENDANT:  I wasn't with anybody.  I was just

7    walking around.

8             THE COURT:  I mean other people that you were around.

9    You were in the group.  I mean we have got the tape where you

10   were taping what was going on.

11            THE DEFENDANT:  Yes.

12            THE COURT:  And your tape itself shows that people

13   who were close to you, associated with the cause that you were

14   here for, were assaulting the police.  Are you saying you don't

15   remember that?

16            THE DEFENDANT:  No, Your Honor.

17            THE COURT:  Then why are you pleading guilty?  I

18   mean, I don't take guilty pleas -- you didn't plead guilty, but

19   you went through a stipulated trial and you --

20            THE DEFENDANT:  Because, Your Honor, I was there.  I

21   know I was there.  I know that much.

22            THE COURT:  Did you realize that you were acting

23   contrary to what the police were indicating you could not do?

24            THE DEFENDANT:  No, Your Honor.  I was just -- I was

25   walking around.

1          THE COURT:  Then why -- I mean, then it is hard for

2    me to conclude that you have the mental element necessary for

3    you to have committed the crimes that --

4          THE DEFENDANT:  I know I have done -- I know I am

5    guilty.  I walked around.  I did not know it was restricted.  I

6    was never taught that in school, Your Honor.

7          THE COURT:  Then I -- it was a stipulated trial, you

8    know.

9          THE DEFENDANT:  I -- go ahead.  I'm sorry.

10          THE COURT:  I have concerns that -- if you are saying

11    despite, you know, what the video shows that you're taping.  If

12    you are saying that despite all of that, that you somehow

13    thought you had a right to be where you were and go into the

14    Capitol like you did, despite all that your video shows, then

15    you have created, it seems, an issue that causes me concern

16    about whether there is sufficient basis for me to conclude that

17    you have the mental element necessary for you to have committed

18    the crimes that I found you guilty of based upon the stipulated

19    evidence.

20          THE DEFENDANT:  I know I am guilty, Your Honor, that

21    I walked around.  I was recording that.  I don't know why I was

22    doing it.  That --

23          THE COURT:  That is not the point.  The point is --

24          THE DEFENDANT:  I don't go into crowds.

25          THE COURT:  -- did you understand that based upon all

1    that was going on, that you were not authorized to go in that

2    building?  Did you think you had a right to go in that building

3    despite all that was taking place?  Are you saying you thought

4    you had a right to go in that building?

5            THE DEFENDANT:  It is hard for me to answer that,

6    Your Honor.

7            THE COURT:  It is something that you have to answer.

8    Because like I say, you know, if you were, you know, didn't

9    realize what you were doing and you were just walking around

10   and didn't think you were doing anything wrong, then I don't

11   see I have a basis for the ruling that I made based upon the

12   stipulation.  I thought based upon the stipulation that you

13   were agreeing to the thing that the government indicated had

14   taken place.

15           THE DEFENDANT:  I know that I did it -- I know that I

16   was there.  I know I walked around.  I know that I walked

17   inside.  That why I was walking around -- I was recording the

18   entire thing from the rally.

19           THE COURT:  Right.

20           THE DEFENDANT:  That there is a lot of people.  I

21   don't do crowds.  That is why I live in the country.  That I --

22           THE COURT:  Are you saying that you thought what you

23   did was legal, that you thought you had a right to go into the

24   Capitol --

25           THE DEFENDANT:  Yes.

1          THE COURT:  -- regardless of everything, windows

2     being broken, alarms going off?  All that was going on, you

3     nonetheless thought you had a right to go into the Capitol?

4          THE DEFENDANT:  Yes, Your Honor, I did think that.

5          THE COURT:  Then I think we have got to go to trial.

6     I think we have got to go to trial.  I mean if that is the

7     honest indication of the situation, I don't see how I can

8     conclude that the stipulated evidence is sufficient for me to

9     conclude that you had the mental capacity or mental intent to

10    commit what I concluded you were guilty of.

11          Government Counsel, you want to say something?

12          MR. TESSMAN:  Yes, Your Honor.  And I believe this

13    issue was addressed on the record in our January stipulated

14    trial.

15          THE COURT:  I do remember and he said something

16    different than what he is saying now.

17          MR. TESSMAN:  I think what is going on here in my

18    impression, every time Mr. Cruz has encountered -- every time

19    Mr. Cruz has encountered either the FBI or this Court, I think

20    it is just his failure to accept what he did.  That is exactly

21    what is going on here.

22          THE COURT:  I understand.  But a stipulated trial

23    admittedly it is not an admission of guilt in order for me to

24    conclude that he, in fact, had the mens rea to commit the

25    crimes that I found him guilty of based upon what he is saying

1      now, I don't see how I can make that determination.

2                MR. TESSMAN:  I think it was addressed at the trial,

3      Your Honor.  And you came to I believe what is the correct

4      conclusion at that time.

5                THE COURT:  Mr. Pierce, anything you want to say

6      regarding that?

7                MR. PIERCE:  We defer to the Court's, you know,

8      judgment on this issue.  What I can say for sure is that

9      Mr. Cruz -- I know Mr. Cruz very well.  And what he is not

10     doing is attempting to answer any questions in any way trying

11     to get any -- he is simply being honest.  And we defer to the

12     Court's judgment on this issue.

13               THE COURT:  I mean, I did, you know, confront this

14     previously.  But he seems to be backing away from what he

15     previously stated.  He says he -- yes, he did enter, but he

16     said he didn't enter with the appreciation that he wasn't

17     permitted to do so.  I mean, I don't understand that.  But if

18     that is the way you feel and that is an honest indication, I

19     just don't see how in good faith I can conclude that I have a

20     sufficient basis to --

21               THE DEFENDANT:  Your Honor, I want to --

22               THE COURTROOM DEPUTY:  It was a CSO, Your Honor.

23               THE DEFENDANT:  Your Honor, I want to try to get this

24     put behind me in order for me --

25               I'm sorry.  Is that better?

1          THE COURT:  Yeah.

2          THE DEFENDANT:  I want to put this behind me.  I have

3    a bunch of kids at home that I need to make sure that I am

4    there for.  That my wife is going insane right now because of

5    all of the kids.  I am the one that takes the kids to school.

6    Picks them up, helps with their homework.  Between you and me

7    that they are smarter than I am most of the times.  I Google it

8    and I act like I am playing on the phone just to get the

9    answer.  I try to make sure I am there for all of their

10   appointments, recitals, everything that has to do with the

11   school.  That I am not -- I am not perfect.  I never will be.

12          I have tried to be honest as much as I possibly can.

13   I figure that honesty is the best answer.  That in order for me

14   to continue being there for my kids, I have to make sure I get

15   this put behind me.  My son just got out of the hospital

16   yesterday.  I don't know what is wrong with him.  I have to

17   hurry up and get my colonoscopy scheduled because back in

18   December is when I had a -- I was really sick for like three

19   months.  I lost a lot of weight.  The emergency room did a CAT

20   scan.  They found a mass a -- a gray mass near my tailbone in

21   my colon.  I can't get that scheduled until I figure out what

22   is going on with court.  I have to make sure that I am there

23   for my family.  I want to get this put behind me.

24          THE COURT:  I understand.  But like I say, if what

25   you are saying is true about not realizing what you were doing

1     amounted to a violation of the law you -- if you thought that,

2     you know, you could go into that building as you did and

3     despite everything that was going on, you know, I just don't

4     see how I can conclude that you, in fact, committed a crime,

5     that you knowingly committed a crime.  I mean, it is one thing

6     to say I went into the building.  It is quite another to say I

7     didn't realize that I wasn't permitted to go into the building.

8     And that is what you are saying.

9              THE DEFENDANT:  When I was in school, I can remember

10    a few things from when I was in school.  I remember that in

11    order for you to go into the White House you have to make sure

12    that you get security checked.  Or if for you go into the US

13    Mint, you have got to go for a security check.  I was never

14    taught that in order to go into the US Capitol that you have to

15    go for a security check.

16             THE COURT:  You do have to -- but if you didn't know

17    that, I understand that.  But what I am saying is that, I find

18    it difficult to understand how somebody could say, considering

19    all that you taped, you saw people trying to break windows out.

20    Alarms were going off.  People were climbing through broken

21    windows.  People were confronting the police.  If you are

22    saying despite having seen all of that and having recorded all

23    of that, that you nonetheless felt that you could go into the

24    Capitol and not commit a crime, I am not prepared to, you know,

25    have you -- or make a finding which I previously made that you

1    are guilty of a crime.  Because if that, in fact, is what the

2    evidence would show, then I would have to conclude that you are

3    not guilty of these crimes.

4                THE DEFENDANT:  All right.

5                THE COURT:  Very well.  If that is his position --

6    Government?

7                MR. TESSMAN:  Your Honor, may I be briefly recessed

8    so I can confer with defense counsel?

9                THE COURT:  Yes, you may.

10               We'll take a short break.

11               THE COURTROOM DEPUTY:  All rise.

12               (Recess taken.)

13               THE COURT:  You may be seated.

14               Yes.

15               MR. TESSMAN:  Yes, Your Honor.  I would just like to

16   briefly address the Court.  Your Honor, it is the government's

17   position that the proper determination as to the intent was

18   made at the stipulated trial in January.  And Mr. Cruz is

19   allowed to, at sentencing, change his story or even frankly

20   tell a falsehood about what he saw on January 6, 2021.  That

21   doesn't change what happened at his trial, so we believe the

22   case should go forward to sentencing.

23               THE COURT:  Mr. Pierce, anything?

24               MR. PIERCE:  I don't have anything to add aside from

25   the fact that I know Mr. Cruz is telling the truth as he stands

1    here right now.  That is for sure.  And we defer to the sound

2    discretion and judgment of the Court.

3            THE COURT:  Very well.  Well, I did make a

4    determination.  We did have some discussion regarding what he

5    is saying now.  And I was satisfied based upon what he

6    indicated at that time.  That he did, in fact, appreciate that

7    what he was doing was wrong, because I specifically asked him

8    that question and he said he did.  So my finding was based upon

9    what he acknowledged at that time.  And I think the government

10   is, I guess, right that is the time period that I have got to

11   use in assessing whether the evidence was sufficient based upon

12   the stipulation for him to have been adjudicated guilty despite

13   what he is saying now.  So I would, therefore, conclude that

14   what he said back then, when the stipulated agreement was

15   presented to me that that is what controls.  And, therefore, I

16   will conclude despite what he is saying now, that there is a

17   sufficient, factual predicate and legal basis for me to

18   conclude that he is, in fact, guilty of the crimes that he is

19   before the Court on.

20           Mr. Cruz, come back up.  Anything else you want to

21   say, sir?

22           THE DEFENDANT:  I just ask the Court if you could to

23   please --

24           THE COURT:  Let me just ask, sir, your oldest child

25   that lives with you is how old?

1          THE DEFENDANT:  He is 18.  He just got released from
2   the hospital yesterday, he -- his kidneys are shutting down.
3   They don't know why.
4          THE COURT:  What is the next oldest child?
5          THE DEFENDANT:  Fourteen.
6          THE COURT:  And when are -- is the 18-year-old, what
7   is his school situation?
8          THE DEFENDANT:  He is actually supposed to be going
9   to Job Corps.  He is supposed graduate this month and then
10  after that, he is going straight to Job Corps.
11         THE COURT:  He is probably not going to do that now
12  with the medical problems he has; right?
13         THE DEFENDANT:  He originally got offered a deal to
14  go into the Marines as well as Job Corps.
15         THE COURT:  Go where?
16         THE DEFENDANT:  Now with medical, he won't be able to
17  do that.  He is still pursuing the Job Corps where he can go in
18  for carpentry.
19         THE COURT:  When is he supposed to do that?
20         THE DEFENDANT:  He is supposed to be doing that a
21  couple of weeks after he graduates.  He graduate May 21st,
22  22nd, one of those dates.
23         THE COURT:  Well, you know, Mr. Cruz, you know, it is
24  not an easy case because, you know, unfortunately, you had the
25  upbringing that you had.  And the sad reality is that you

1     didn't have the type of parenting that children are entitled to

2     have and that children need in order to grow up into healthy

3     law-abiding citizens.  And that is always unfortunate.  And

4     because of that I mean, I do take into account one's upbringing

5     in deciding, you know, what the appropriate sentence is in a

6     case.  And that is especially true when I have a young person.

7     Because before I served on this Court, I served on a local city

8     court.  And I sat in juvenile court and sat in adult criminal

9     court.  And I had a lot of young people who did things that

10     were not acceptable and not even, you know, understandable, but

11     you could appreciate why they did the things that they did

12     because of the lack of appropriate parenting and love and

13     attention that kids need.  And so I would, obviously, take into

14     account youthful indiscretions that did engage in because of

15     the circumstances under which they were raised.

16        And so, you know, despite your prior record, which is

17     not great, I understand why some of those things may have

18     happened because of the situation that you set forth regarding

19     your upbringing.  But at some point, you have to take

20     responsibility for your conduct.  And you can't continue to say

21     when you are at your age that what happened to me as a youth is

22     somehow an excuse for what I am doing now.  That is just not

23     acceptable.  And in this situation, yes, there is no indication

24     that you engaged in any type of violence or destruction of

25     property.

1            But as the government said, it was the mob mentality

2    that permitted this event to have taken place.  It is a

3    disgrace to this country that people would feel they had the

4    right to come to Washington -- yes, to protest.  That is the

5    way things should be.  I totally agree with the right of the

6    American public to protest.  I wouldn't be where I am, as a

7    person of color, if protest was not something that was condoned

8    in this country.  Because it was peaceful protests that brought

9    about the change that has given people of color the opportunity

10   to be full citizens in this country.  So I fully embrace the

11   right of people to protest.  But it is one thing to protest

12   peacefully.  It is quite another to associate yourself with

13   people who are protesting and engaging in violence.  And here,

14   you know, despite what you are saying now, consistent with what

15   you indicated earlier -- you know, if more people had said,

16   look, this is wrong.  I came here just to express my opposition

17   to the electoral result, despite how irrational, in my view, it

18   was for people to feel that somehow the election was stolen.

19   There have been 60-some courts that have heard, you know,

20   challenges to the election.  And all have concluded that there

21   is just no basis for the conclusion that Mr. Trump won.  He did

22   not.

23           And if we are going to be in a situation in this

24   country -- because at some point the democrats are going to

25   lose.  So do the democrats say that, you know, we are not going

1    to accept the result and do what happened on January 6th, just

2    like those Trump supporters did?  We can't have that in this

3    country.  There has to be an acceptance that when the poll

4    results indicate that one party won as compared to the other,

5    it is something that we have to accept.  That is what

6    democratic societies do.  What happened on January 6th is what

7    you see in banana republics.  It is what happens in those

8    countries that are third world countries where electoral

9    process doesn't mean anything.  It is the strong man who wins.

10   And that is something that will destroy this country if we

11   don't rectify it.

12           And I think the reality is that there has to be a

13   message sent.  There has to be punishment.  People have to

14   understand that if you are not going to accept electoral

15   results that are supported by the courts and supported by all

16   of the research that has been done that looked into it and you

17   cause yourself to become involved in the mob mentality that

18   resulted on January 6, that you are going to have to pay a

19   price.  Maybe, maybe, the next time around when people are

20   unhappy with the result, maybe they will think and they will

21   say, well, even though I don't like the result and even though

22   I don't agree with the result, I am not going to do what

23   happened back on January 6 of '21.  Because if I do, I am going

24   to get punished.  And maybe that will make them stay home or

25   even if they come to Washington and something like this is

1   about to happen again, they will turn and walk away.  And maybe

2   that will make other people walk away.  And maybe we won't have

3   what took place on that day occur.  I mean, police officers

4   committed suicide because they were subjected to this medieval

5   hand-to-hand combat.  People died, millions of dollars in

6   damage was done to our Capitol.  The Capitol was disgraced by

7   what happened.  And, therefore, I don't feel I have any other

8   alternative other than to punish you, despite your situation.

9           But I am sympathetic to your situation.  I understand

10  based upon what you are saying that you are going to have to

11  get some medical care in reference to a medical situation you

12  are experiencing.  I am sympathetic to your family situation

13  and your children.  It is always unfortunate when adults do

14  things like you did here and put your freedom in jeopardy,

15  which is, in my view, not having taken into account the

16  interest of your children.  Because you should have realized

17  that if I do something that is going to cause me to commit a

18  crime, I might be taken way from them and put myself in the

19  position that you are in now.  And you didn't think about that.

20  You weren't thinking about your kids that day.  You were

21  thinking about something else, i.e. the election that you

22  thought was stolen.  And that was more important to you that

23  day than your children were, because if you had been thinking

24  about your children and putting them first, you would have

25  said, hey, I got to get away from this because I don't want to

1   be separated from my kids.  And you didn't do that.  So, you

2   know, the guideline is what the guideline is.  Since you

3   didn't, yourself, actually engage in any violence and since

4   you, yourself, did not actually do any damage, I think those

5   factors, and despite your criminal history, which is, you know,

6   problematic.  It has been years since you previously committed

7   a crime.  And you didn't do well, when you were on supervision.

8   But again, you know, I chalk that up to youthful indiscretions,

9   so I am not going to hold that against you, although it is,

10  obviously, a factor I have to consider.

11          But in assessing whether a variance downward from the

12  guideline is appropriate, I would conclude for the reasons I

13  indicated, the lack of any violence on your part and the lack

14  of any destruction of property on your part and the fact that

15  even though you have, you know, a significant record, it has

16  been years since you were involved in criminal activity, I

17  would conclude that a below guideline sentence is appropriate.

18  But that below guideline sentence despite all of the situations

19  that you have explained to me is not sufficient for me not to

20  send a message and to punish you.  And to send a message to

21  others, that if you are going to do something of this nature

22  again and basically threaten our democracy, there is a price to

23  pay.  Otherwise next time around, if people feel there is no

24  price to pay, then why not do it?  And that is just not a

25  message that I think this Court can send.

1    So taking into account your situation, I would hope

2    that your 17- and 14-year-old children, although they are

3    young -- 18 you said and 14, that they will be able to provide

4    for your their younger siblings for some period of time while

5    you are detained.  Because I think that some period of

6    detention is appropriate.  The probation department has

7    recommend 90 days.  The government has recommended more.  But

8    in order to give your son who wants to go into the Job Corps --

9    he is not obviously going to be able to go into the Marines

10   because of his physical situation.  And, you know, since you

11   say he finishes school on May 21st, I am going to sentence you

12   to a period of 45 days in prison on Count 1 of the information.

13   And I am going to sentence you to 45 days also on Count 2.

14   Those sentences are to run concurrent with each other.  And I

15   will place you on supervised release on Count 1 for a period of

16   1 year.

17          And hopefully, with that sentence, your wife will be

18   able to keep her job and your older children will be able to

19   care for the younger children while you are detained.  That is

20   the best I can do under the circumstances.  And it is really

21   something I had not intended to do when I came into this

22   courtroom.  Because I didn't know about your children

23   situation.  I was prepared to give you the 90-day sentence that

24   the probation department had recommended.  But under the

25   circumstances, only because of my concern about your children

1    and your wife's ability to keep her job and to bring money to

2    the house to take care of those children did I impose the

3    sentence that I imposed.

4              It has been recommended I give you a $5,000 fine.

5    But considering your financial situation and the obligations

6    you have in reference to your children, I would conclude that

7    you don't have the capacity to pay a fine.  However, I do have

8    to require that you pay restitution to some amount.  It is not

9    nearly what you should have to pay.  But since the government

10   has agreed in the past that people pay at least $500 as

11   restitution to pay for the cost of repairing the Capitol, I

12   will impose a restitution amount of $500.  And I will require

13   that once you finish your prison sentence, that you pay at

14   least $25 per month towards that restitution amount.  And that

15   will be paid here to the Court and then forwarded to the

16   Architect of the Capitol.  You do also have to pay $35 as a

17   special assessment to the Court.  And I will require that be

18   paid within 30 days after you complete your prison sentence.

19             I will under the circumstances permit you to self

20   report to the Bureau of Prisons to serve your sentence.  They

21   will be in touch with you.  And you will have to report when

22   they tell you to report.  But I will require that that not

23   occur until after May 21st when your oldest child is graduating

24   from high school.  So you will have to report at some point

25   after that and then serve your 45 day sentence at that time.

1          The conditions of your supervised release that you

2    will have to comply with while you are on supervision are, one,

3    that you cannot be rearrested for any reason whatsoever.  Do

4    you understand that, sir?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  You must also cooperate with your

7    probation officer and meet with that person each and every time

8    they tell you to.  Do you understand that?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Also, you cannot possess or use any type

11    of illegal drugs.  There is no indication that there is any

12    recent use, but, nonetheless, I will require within 15 days of

13    you being placed on supervision that you be tested to see if

14    you are using drugs.  And that you be tested periodically

15    thereafter at the discretion of the probation department.

16          You are in Colorado?

17          THE DEFENDANT:  Missouri, Your Honor.

18          THE COURT:  Missouri.  I will authorize that your

19    supervision be transferred.  I will maintain jurisdiction over

20    your case.  But if it is deemed appropriate for your

21    supervision to take place out there in Missouri, I will

22    authorize that be the case.  I also will require that you be

23    evaluated to see whether any type of mental health intervention

24    is necessary.  And if it is decided that it is, that you

25    participate in that until it is decided that it is no longer

1   necessary during your period of supervised release.  Also, that

2   if it is felt that drug treatment, which it doesn't appear to

3   be the case, is necessary, that you participate in that drug

4   treatment.  Also, while you have an outstanding obligation

5   financially to the Court that you provide any financial

6   information to the probation department needed in order to

7   ensure that you pay your obligations to the Court.  And that

8   you not create any type of new financial obligations without

9   the authorization of the probation department to do so while

10  you are on supervision.  Also, I would require that you not

11  possess any type of firearms or other dangerous items that are

12  weapons while you are on supervision.

13          And I will require, because I do on a regular basis,

14  within 30 days of your release from your prison sentence, I

15  will require that there be a reentry hearing conducted.  And

16  since you are out of Missouri, I permit that to be done

17  remotely.  So you will get information about the call-in

18  information.  And we will have you call in so I can stay on top

19  of you to make sure that you are complying with the obligations

20  that you have to the Court.

21          You have 15 days from today's date to appeal your

22  sentence and your conviction to the Court of Appeals.  If you

23  cannot afford to pay for a lawyer to represent you on appeal or

24  if you cannot afford to pay for the -- to let the Court know

25  that you want to file your appeal, those expenses will be paid

1    free of charge by the government.

2              Anything else from probation?

3         MS. LANDON:  No, Your Honor.

4         THE COURT:  Anything else from the government?

5         MR. TESSMAN:  Your Honor, your law clerk informed us

6    that we should move to dismiss the original information, which

7    is at docket 7 in order to close the case.

8         THE COURT:  Very well.  You so move?

9         MR. TESSMAN:  We so move, Your Honor.

10        THE COURT:  Very well.  Motion granted.

11        Mr. Pierce, anything else?

12        MR. PIERCE:  No, Your Honor.

13        THE COURT:  Very well.  Mr. Cruz, I hope you

14   appreciate that I gave you a break that I wasn't inclined to

15   give you when I came into this courtroom.  And I hope that you

16   will take advantage of that and we won't see you in the Court

17   system anymore.

18             THE DEFENDANT:  Thank you, Your Honor.

19             THE COURT:  Thank you.

20             (Proceedings adjourned at 10:36 a.m.)

21

22

23

24

25

1                          C E R T I F I C A T E

2

3            I, SHERRY LINDSAY, Official Court Reporter, certify

4     that the foregoing constitutes a true and correct transcript of

5     the record of proceedings in the above-entitled matter.

6

7

8

9

10                       Dated this 7th day of May, 2023.

11

12           _____   _____

13                       Sherry Lindsay, RPR
                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25